**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT COURT OF NEW YORK**

| | |
|---|---|
| MACARIA MEZA, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>   v.<br><br>CONSTELLATION BRANDS, INC., BILL NEWLANDS, and GARTH HANKINSON,<br><br>          Defendants. | Case No. 6:25-cv-6107<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Macaria Meza ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by her counsel, which included, inter alia: (a) review and analysis of relevant filings made by Constellation Brands, Inc. ("Constellation" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Constellation's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Constellation's securities between April 11, 2024 to January 8, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Constellation's full year 2024 fiscal results and financial outlook for 2025. The outlook for 2025 depended upon Defendants' efforts to improve product mix, inventory, and sales execution in its Wine and Spirits business, specifically focusing efforts within its premium and above brands to drive more consistent growth. These efforts also included investments in media spend and price promotions as well as adjustments in sales capabilities to support distributor partners.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning Constellation's ability to deliver increased profitability, specifically in its Wine and Spirits division. This caused Plaintiff and other shareholders to purchase Constellation's securities at artificially inflated prices.

4.      The truth emerged on January 8, 2025 when Defendants issued a press release announcing the Company's third quarter fiscal year 2025 results. In pertinent part, Defendants presented a significant miss on sales performance in the Beer segment and an even steeper miss for the Wine & Spirits.

5.      Investors and analysts reacted immediately to Constellation's revelation. The price of Constellation's common stock declined dramatically. From a closing market price of $219.28 per share on January 8, 2025 to $181.81 per share on January 10, 2025.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of herself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 18 of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Constellation is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased Constellation's common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing her transaction(s) in Constellation is attached hereto.

12.     Constellation is a Delaware corporation with its principle executive offices located at 50 Broad Street, Rochester, New York 14614. During the Class Period, the Company's common stock traded on the NYSE under the symbol "STZ".

13.    Defendant Bill Newlands ("Newlands") was at all relevant times, the President and Chief Executive Officer of Constellation.

14.    Defendant Garth Hankinson ("Hankinson") was at all relevant times, the Executive Vice President and Chief Financial Officer of Constellation.

15.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Constellation's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

16.    Constellation is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

17.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Constellation under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

18.     Constellation together with its subsidiaries, produces, imports, markets, and sells beer, wine, and spirits in the United States, Canada, Mexico, New Zealand, and Italy. The company provides its products to wholesale distributors, retailers, on-premise locations, and state alcohol beverage control agencies.

### *The Defendants Materially Misled Investors Concerning Constellation's Substantial Growth in its Wine and Spirits Division*

### *April 11, 2024*

19.     On April 11, 2024, Defendants issued a press release announcing its full year 2024 financial results. The press release also provided Constellation's expected full year guidance for 2025, stating in pertinent part:

> Beer Business delivers strong fiscal 2024 net sales and operating income growth over 9% and 8%, respectively, primarily driven by the 14th consecutive year of volume growth and record share gains from continued strong demand for our high-end brands
>
> Wine and Spirits Business delivers results aligned with lowered fiscal 2024 outlook against challenging marketplace dynamics and expects to deliver improved net sales performance in fiscal 2025 Updates fiscal 2025 reported EPS outlook to $14.63 - $14.93 and affirms comparable EPS outlook of $13.50 - $13.80, including shares repurchased through June 2024

20.     CEO Bill Newlands stated, in relevant part:

> We delivered another year of solid performance in Fiscal 24. Our Beer Business continued its strong growth momentum as it achieved its 56th consecutive quarter of volume growth while maintaining best-in class margins. These results were driven by sustained growth of our industry-leading beer brands that continue to gain share. As we head into Fiscal 25, we remain confident and excited about the growth trajectory of our Beer portfolio. ***We continue to see growth potential in our Wine and Spirits business as we focus on strong commercial and operational execution.***

21.     CFO Garth Hankinson stated, in pertinent part:

> Our enterprise results in Fiscal 24 exceeded our top-line growth outlook and delivered strong operating income growth. We also generated strong operating cash flow, which enabled continued execution of our capital allocation priorities including: reducing our net leverage ratio from 3.6x to 3.2x, returning over $900 million to shareholders in dividends and share repurchases, and deploying approximately $900 million to modular brewery capacity additions to support the growth of our Beer Business. ***We believe this momentum will continue and we expect to deliver additional shareholder value in Fiscal 25.***

(Emphasis added.)

22.     On the same day, Defendants an earnings call that included Defendants Newlands and Hankinson on behalf of Constellation. During opening remarks, Defendant Newlands commented on strategic changes being put in place to deliver growth and profitability to the Company's Wine and Spirits segment, stating, in part, as follows:

> In our wine and spirits business, we faced a series of near-term category headwinds throughout fiscal '24 but remain confident that our strategy is sound. We recently promoted Sam Glaetzer to serve as our new President of Wine and Spirits. He is a well-rounded and accomplished industry veteran with nearly 30 years of experience in the wine and spirits category and a successful track record of driving commercial and operational efficiency and effectiveness.
>
> Sam also played an integral role in the implementation of the business transformation over the last few years, leading our global end-to-end supply chain optimization initiatives and building a world-class farming, winemaking and distilling network, aligned to consumer preferences while developing a focused international route to market to deliver incremental growth for the business in the medium term.
>
> ***Now with the strategic transformation of our Wine and Spirits portfolio is largely complete, Sam is well positioned to lead our team in driving enhanced focus on execution, and the delivery of growth and improved profitability. To that end, our Wine and Spirits team has identified several immediate actions to help drive improvement in our year-over-year top line performance, which I'll discuss in more detail shortly***.

. . .

*While we do not expect ongoing challenges in the Wine and Spirits category to immediately subside, particularly in the mainstream and premium price segments, we have identified several areas to improve the performance of our wine and spirits business in fiscal '25, including, but not limited to, refocusing our efforts within our premium and above brands to more consistently drive growth in our most scaled and central offerings, notably in Crawford, Meiomi, The Prisoner, High West and Mi Campo while accelerating additional tactical investments to revitalize the equity and support demand for our largest mainstream brand, Woodbridge, and ensuring that we continue to support the transformation of other significant brands in our portfolio such as SVEDKA, Vint by Robert Mondavi, Ruffino and Lumina.*

. . .

Another key area we are focused on is aligning with our U.S. wholesale distributor partners on clear priorities to help enhance our performance in our largest markets and channels.

As noted in our prior call, these priorities include enhanced focus on improving mix, inventory and sales execution. We will also be making additional investments in media spend and price promotions as well as adjustments in our own sales capabilities to better support the execution and go-to-market efforts of our distributor partners. And similar to our beer business, we will continue to focus more broadly on efficiency opportunities to drive operational and sales excellence across our Wine and Spirits segment.

This will include the operational and supply chain initiatives highlighted at our Investor Day as well as enhancements to the business's organizational structure to enable a more effective and competitive operating model. Looking forward to fiscal '25, we expect our Wine and Spirits business net sales to be relatively stable and operating income to be down 9% to 11%.

While we believe the focus on sales execution I just outlined will help stabilize the top line growth for Wine and Spirits, our operating income guidance reflects incremental investments in additional media spend price promotions and sales capabilities as well as continued inflationary pressures on some cost of goods sold and lapping of distributor contractual payments and reduced incentive compensation that occurred in fiscal '24. As we noted, we remain committed to continuing to advance this business over the coming years toward the medium-term targets shared at our Investor Day.

Moving on to capital allocation. we continue to deliver against our stated priorities and targets in fiscal '24. As noted earlier, we further strengthened our balance sheet with a reduction in our net leverage ratio, supported by our strong earnings performance and our disciplined debt management.

. . .

***We are confident in our ability to continue to create shareholder value and deliver on our commitments, including achieving low double-digit comparable EPS growth by generating high single-digit net sales growth and delivering best-in-class margins for our beer business, managing category challenges and improving the growth trajectory of our Wine and Spirits business with enhanced execution and maintaining our capital allocation discipline and commitment to operate in a way that is good for business and good for the world.***

(Emphasis added.)

23.    Defendant Hankinson highlighted Constellation's plans to increase growth in fiscal 2025 stating, in pertinent part:

***For Wine and Spirits net sales, we expect to largely offset ongoing category headwinds as we drive the sales and marketing execution initiatives described by Bill earlier. Additionally, we expect mix-related benefits due to the better performance in our higher-end brands. That said, we continue to anticipate overall volume growth to remain challenged, particularly due to demand headwinds in the mainstream and premium price segments, which account for a major part of our volumes. Furthermore, from a net sales perspective, we are expecting unfavorable lapping of bulk sales through fiscal '24.***

From a cadence perspective, we also expect quarterly and half yearly shipments and depletion shares of the full year total to be fairly aligned with fiscal '24. For fiscal '25 operating income, we expect comparable enterprise-wide growth between 8% and 10%, reflecting 10% to 12% operating income growth for our beer business, a 9% to 11% operating income decline for our wine and spirits business and a slight increase in corporate expense to approximately $260 million.

. . .

8

Our Wine and Spirits business faced difficult market conditions in FY '24, but we've identified key actions to improve execution and performance.

***As we look ahead to fiscal '25, we are confident that we can deliver against our plan with strong enterprise results aligned with our medium-term targets, execute our capital allocation priorities and seek to create value for our shareholders.***

(Emphasis added.)

24.     During the question-and-answer segment of the call, Defendant Newlands continued the false impression given to investors during his opening remarks. For example, when asked by an analyst regarding Constellation's inventory management and strategies to increase revenue in its Wine and Spirits division, Defendant Newlands stated in pertinent part as follows:

<Q: Lauren Rae Lieberman – Barclays - Analyst> I was just curious, you gave a lot of help and color on the Wine and Spirits…just curious to hear your take on kind of the promotional environment and kind of state of the union on inventory levels within the system, knowing it's tough to have visibility within 3 tier, but just curious your view on inventory in the system online.

<A: William A. Newlands> We did see some inventory reduction this past fiscal year, particularly in Canada. There was quite a bit of inventory realignment in Canada. And certainly, there has been some that we've seen in the U.S. as well. The thing that I think is important for us to continue to focus on is we've made a number of changes.

We're going to focus on those 11 brands that are really the biggest drivers of our success. That's a bit of a change.
Frankly, we'd probably peanut buttered our efforts a little too broadly in the past, and we're going to focus on those brands that we believe have real growth potential for the long term. We're also going to do a bit more promotional spend than we have in the past, particularly on brands like Woodbridge, where that's an important part of the consumer dynamic.

A lot of work and research has been done in the last few months to make sure that we understand all of the consumer dynamics around our critical brands, and we will execute against those dynamics in this coming year. And I think that's reflective of an improved

pipeline that you see this year, acknowledging there'll be a bit of a reset at the bottom line.

<Q: Gerald John Pascarelli - Wedbush Securities Inc.- Analyst> But based on current trends, I think the outlook for the year came in above expectations, definitely above our expectations. So I guess in the context of 2 guide downs last year, if you could maybe provide some more commentary just on your level of confidence this early in the fiscal year in achieving flat revenue performance, that would be great. And then does your outlook embed the assumption that the wine category will ultimately start to improve from current levels this year?

<A: William A. Newlands> think, obviously, Garth and I spent a lot of time with our Wine colleagues over the last few months, looking carefully at what we thought was critically important. The reflection of an improved performance has several variables involved. One, we're going to work much more closely and enhance our sales capabilities to support our distributor network. I think we've gotten much more aligned as to what our intentions and expectations are, both from distributor to us and us to distributors than where we had been as we came out of last year.

Second, we've refocused our priorities. There are 11 or so critical brands that did not probably have the right amount of prioritization within our overall portfolio, and we have radically addressed that. Third, we're going after efficiencies within the business, and we think there are those to be had.
. . .

And we're putting some of the same resources against our Wine and Spirits business that helped generate that very strong result last year. So there's a number of elements that we are putting in place, recognizing this is going to be a bit of a reset year, particularly at the bottom line for the Wine business.

*May 29, 2024*

39.    On May 29, 2024, Defendants Newlands and Hankinson presented on behalf of Constellation at the Bernstein 40th Annual Strategic Decisions Conference where they discussed the significant changes made to increase profitability with respect to the Company's wine business:

<Q: Nadine Sarwat Sanford C. Bernstein & Co.- Analyst> So last time you were here on the stage, I asked you if you would consider

divesting your wine business. And your response was very honest, and I quote, "There are no sacred cows in our business. There might have been at one point, but there are no longer." And so here, 1 year on, what is your view on the role of the wine business in your portfolio today?

<A: William A. Newlands> Well, certainly, Nadine, we expect all of our businesses to perform. And frankly, we've had some challenges with our wine business. So we have put a fair amount of work into it. What I would say is the business is very different. We -- from -- if you think about what it was, say, 5 years ago, we've got 1/10 of the amount of mainstream brands that we had 5 years ago. So we've pretty radically addressed what our portfolio looks like, moving a disproportionate amount of our business to the higher end, where there's better growth, better margins and certainly a more strategic play.

<Q: Nadine Sarwat Sanford C. Bernstein & Co.- Analyst> I think everybody appreciates the efforts to turn around brands, investing in brand building for the core brands in the business. But this is all against a wine business that is, for the industry as a whole, a very challenging time. So if we cast our minds beyond just this year, which you provided guidance for, and we look out over the next couple of years, how do you see the potential for that business sort of a normalized run rate, if you will, considering the challenges the industry faces today?

<A: William A. Newlands> One is we had peanut buttered our spend a bit too broadly. We've got 10 or 11 brands that really matter, including the 2 at the low end of the mainstream segment, which we needed to shore up. So that's one. So we focus much more attention on the brands that matter.

Secondly, some of that business is tactical. We had probably gotten away from some of the key tactical work that needed to be done. So we put more focus on tactical work with some of our brands, particularly those that play in the lower price points.

Third, we think the cost structure had gotten a bit out of whack. And a bit of what we've done this year is put some very aggressive cost approaches in that business.

For instance, Garth mentioned earlier about the procurement and logistics capabilities that we brought into our beer business. The gentleman that has overseen that is now working with our Wine and

Spirits business as well, and we think that's going to provide some strength on the cost side of that business.

<A: Garth Hankinson>  I mean, so obviously, the guidance provided for FY '25 is not in line with what we laid out at Investor Day. That being said, we are still committed to the longer -- to the midterm algorithm that we did lay out at Investor Day, meaning we do believe we can achieve 1% to 3% top line growth and 25% to 26% operating margins over the medium term.

The deep dive that Bill and I have been performing with the team really has given us greater conviction that the strategy that we have in place is still the right strategy. Continuing to lean into the premiumization trends that have been ongoing for a long period of time and show every sign that they will continue, that's the right strategy. Diversifying our business away a little bit from the U.S. wholesale into DTC and to the international -- select international markets is the right approach. And so we think we'll see improvement.

***Again, the guidance for this year is not where we would have I liked it to have been. That being said, we are expecting to see sequential improvement as we move through the year. Similar to our beer business, not every quarter is going to look the same. We would expect to see improvements in both the top and bottom line sequentially as we move through a number of the initiatives that we reviewed with the team and have been put in place.***

***We'll start to show dividends, if you will, through most of the year and keep that business a little bit different than our beer business, which, in beer, we do about 55% in the first half and 45% in the second half versus Wine and Spirits. So we do expect to see, as we move through the year, that, that business will improve.***

(Emphasis added.)

### *July 3, 2024*

40.    Defendants issued a press release on July 3, 2024 announcing first quarter 2025 financial results, reiterating that Constellation's Wine and Spirits division is initiating "commercial and operational actions expected to drive net sales and operating income improvements and affirms fiscal 2025 outlook."

12

41.     Defendant Newlands reiterated Constellation's 1Q financial results and expressed confidence in meeting full year guidance:

> Our Beer Business continued to achieve strong volume growth well above that of its category and total Beverage Alcohol. This outstanding performance supported the second largest dollar share gain within the broader Beverage industry and reinforced our significant growth outperformance relative to the entire CPG sector.
>
> Our Wine and Spirits Business is making good progress against the operational and commercial execution initiatives identified in Q4 of Fiscal '24 to support its trajectory toward this year's guidance. All in, we continue to make progress and remain focused on our Fiscal '25 outlook.

42.     During the same day earnings call, Defendant Newlands touted the Company's progress with regard to its operational and executive initiatives, while detailing plans to improve future growth:

> Staying with Wine and Spirits for a moment. While the performance of the business continues to face near-term challenges largely driven by broader category headwinds, we expect net sales and operating income improvements and our outlook for the fiscal year is unchanged.
>
> Lastly, all in, we drove comparable earnings per share growth of more than 17% and remain focused on achieving our stated full year guidance and medium-term target of low double-digit comparable EPS growth.
>
> In addition, we continue to make good progress against the operational and commercial execution initiatives identified last quarter to support our efforts to improve the performance of this business in fiscal '25. The tactical investments in the 11 brands that represent 75% of net sales and over 80% of volumes for our Wine and Spirits business in fiscal '24 are now underway. And we expect to see improvements in the select group of our most scaled offerings over the remainder of the year, ultimately underpinning the relatively stable net sales outlook for that business in fiscal '25. However, these incremental investments did have a near-term impact on the operating income, which declined 25% in the first quarter.

That said, we also expect year-over-year operating income performance of our Wine and Spirits business to improve throughout the remainder of the year. And we continue to target wine and spirits operating income to be down 9% to 11% in fiscal '25. As we have noted previously, we remain committed to continuing to advance this business over the coming years towards the medium-term target shared in our Investor Day.

. . .

***Our Wine and Spirits business is making progress against the operation and commercial execution initiatives identified last quarter to support its trajectory for this year's guidance. All in, we continue to advance toward our enterprise-wide financial targets, including the delivery of double-digit comparable EPS growth while upholding our disciplined and balanced capital allocation priorities from the last 5 years, which so far this fiscal year has also included the return of over $240 million to shareholders in share repurchases through June.***

(Emphasis added.)

43.     During the question-and-answer segment, Defendant Newlands was asked about the Company's guidance with respect to its wine business.

<Q: Nadine Sarwat Sanford C. Bernstein & Co.- Analyst> I guess I'll ask about wine. The guidance for the year implies a pretty substantial pickup in sales growth, I guess, in the second half. What kind of visibility do you have with your distributors on how the commercial turnaround is going? Are they making bigger commitments about what they're willing to take on because it does imply a pretty steep ramp.

<A: William A. Newlands> ***We already always said, especially after our prior quarter, that we were going to take 9 to 12 months to get our wine business back into the position that we expected to do. We're pleased with what the work that's been done. I think we're ahead of schedule on some of the operational points that we expect, recognizing they're likely to be second half loaded because once you put in the work, you have to wait to get the results out of them.***

***Second, I think we've seen some significant improvement in our engagement, particularly with our wholesale network. And we believe that's going to create good opportunity in the back half of this year.***

14

Some of the reexpression of our marketing dollars that we have put in place, you saw some of that play out in that in terms of the early spend in this quarter are already showing some positive signs. And we look forward to reporting on those as we go forward. But certainly, we expect the improvement in this business to be back half loaded as we've said now a couple of times.

I think the other thing to also recognize, both our international business and our DTC business are performing ahead of what we had planned. The place where we're still spending a lot of time and energy is on the wholesale portion, but we're working very closely with our key wholesale partners to deliver against those expectations. And I think, fortunately, we are all on the same page about what needs to be done and what delivery we expect against that business as we progress through the year.

(Emphasis added.)

<u>*September 3, 2024*</u>

44.     On September 3, 2024, Defendants issued a press release updating the Company's financial outlook for fiscal 2025. The press release stated, in pertinent part:

> Updates Enterprise net sales growth to 4% - 6%, reported operating income decline to (68)% - (36)% including an expected Wine and Spirits goodwill impairment loss of approximately $1.5 - $2.5 billion(2), and comparable operating income growth to 8% - 9%

> Updates Beer net sales growth to 6% - 8% and raises Beer operating income growth to 11% - 12%, at higher-end of initial range, and updates Wine and Spirits net sales and operating income declines to (6)% - (4)% and (18)% - (16)%

45.     On the same day, Defendants participated in the 33rd Annual Barclays Global Consumer Staples Conference during which Defendants discussed the Company's updated fiscal 2025 guidance. Defendant Hankinson discussed Constellation's investment in the Wine and Spirits division stating:

> We're taking that same approach. We're investing incrementally in some tactical pricing actions as well as marketing actions to support the demand of our largest, most important wine brands.

> Unlike Beer though, the cost savings agenda hasn't yielded enough results to offset some of the deleveraging, which is what's driving the bottom line down there a little bit. But if I think about this from an enterprise-wide perspective, it's very much a positive story.

46.    CEO William A. Newlands further discussed the Company's strategy as to its Wine and Spirits division stating, in relevant part:

> We're doing a lot of cost work on the wine side, as I think we needed to do, and we would expect to see some of that start to be reflected in the back half of the year. And the -- our work with our distributor partners, I think, is better than what it has been in recent years. I think that's an important piece of what we're doing. But there's no question in the macro environment, particularly on the wine side, has been more challenging than we anticipated.

47.    During the question-and-answer portion of the conference, Defendants remained confident in the strategic initiatives put in place to promote growth in its wine business despite the macro environment:

> <Q: Lauren Rae Lieberman – Barclays Bank – Analyst> I mean, it sounds like the -- because of the execution, right, a lot of this is going to be, by definition, gradual, like you can't really reposition a brand overnight. So how should we think about the next major milestones you're watching for, like a validation that the strategy is working?
>
> <A: William A. Newlands> Well, you might remember, at the beginning of this year, we said it was going to take 9 to 12 months for this thing to fully kick in, in terms of all the work. Garth and I spent months at the early part of the calendar year, with our Wine and Spirits team, working out what needs to -- what do we need to be doing, what the focus needs to be on and what our operating plan was going forward.
>
> Recognizing just what you said, it doesn't turn on a dime, particularly when the macro environment is not as healthy as we'd like to see. But we are expecting to see incremental progress in the back half of this year against many of those initiatives that we put in place as we start to track to that 9- to 12-month time frame.
>
> <A: Garth Hankinson > Yes. I mean we're doing -- just to double down on what Bill said, we are expecting to see some improvements in the second half of the year, both from cost saving initiative actions

16

that we took in the first half of the year as well as some of the support we're doing with the tactical pricing and marketing.

But we're controlling the controllables, right? I mean we're taking costs out of the business. We're tactically investing in both pricing and marketing actions to support demand. Clearly, the category has got to do better, but we're executing certainly according to how we laid out at the beginning of the year.

<Q: Lauren Rae Lieberman – Barclays Bank – Analyst> But we get asked all the time what is sort of the unanswerable, like are people just drinking less, why are they drinking, is this just a temporary dynamic on younger generations and change of behavior?

<A: William A. Newlands> We haven't been as successful as an industry, nor have we yet, on the wine side, creating some of that thing that opens up interest. I think the important part for us is we're investing in areas that can be approachable if the consumer does change, and that is on the betterment side.

On the wine side, we've done it with Illuminate from Kim Crawford or -- and we've done the same thing in our Meiomi brand. You saw it in Corona Non-Alcoholic. Non-alcoholic beer is only 3% of the total industry today, but it was 1% 5 years ago. So we're putting ourselves in a position where if there is some movement with consumers that we have an offering there to attract them if their behavior does change.

*October 3, 2024*

48.     On October 3, 2024, Defendants issued a press release announcing second quarter

2025 financial results, stating, in relevant part:

> Beer Business dollar sales growth outperforms total beverage industry and combined beverage alcohol categories in Circana tracked channels; disciplined operational efficiency and cost management initiatives enable incremental marketing investments launched in Q3 of fiscal 2025
>
> Wine and Spirits Business continues to advance commercial and operational actions expected to drive sequential net sales and operating income improvements in Q3 and Q4 fiscal 2025

49.    Defendant Newlands touted the Company's strong performance for the second quarter, specifically a double-digit increase in comparable EPS in line with full year guidance for 2025, stating, in relevant part:

> While the current macroeconomic backdrop has weighed on demand for beverage alcohol – and for consumer packaged goods, more broadly – we continued to deliver strong performance in Q2 of Fiscal '25. Our company once again outperformed the dollar sales growth of the total CPG sector, and our Beer Business remained both the #1 share gainer in its category and a top 3 share gainer in the broader beverage industry. Our relentless focus on delivering top-tier growth and winning in the marketplace, as well as on driving efficiencies, "We achieved an important milestone of our capital allocation priorities, having reached our target ~3.0x net leverage ratio, on a comparable basis. Importantly, consistent with those same priorities, we also returned an additional ~$250 million of cash to shareholders through share repurchases, while continuing to pay our dividend and advance our brewery investments. We are also pleased to be deploying incremental marketing investments in our Beer Business, as our cost savings and efficiency initiatives have supported another quarter with a double-digit increase in comparable EPS, in line with our full-year outlook.

50.    On the same day earnings call, Defendant Newlands reiterated Constellation's strategic transformation of its Wine and Spirits portfolio and remained confident in delivering profitability in line with 2025 guidance, stating, in pertinent part:

> ***Against that backdrop, the business remains focused on continuing to advance the operational and commercial execution initiatives identified at the end of our last fiscal year to improve the performance of our largest Wine and Spirits brands. Encouragingly, we saw some green shoots in Q2 across our largest higher-end wine brands, Kim Crawford, Meiomi, The Prisoner, as tactical pricing and marketing support actions we are taking in select markets began to drive better consumer takeaway trends. So we plan to continue these actions through the remainder of the year to drive further improvements in this select group of our most scaled higher-end offerings, which ultimately underpins the sequential improvement we expect in our Wine and Spirits business over the second half of fiscal '25 for our updated outlook.***

> Also notably, our Craft Spirits portfolio, albeit smaller in scale continues to be a positive driver for the business, delivering strong

depletion volume growth as well as high single-digit dollar sales growth in Circana U.S. tracked channels, significantly outperforming the low single-digit growth rate of the higher-end spirits segment. Looking ahead for our recent updated fiscal '25 outlook, we expect the Wine and Spirits business to ultimately deliver for the full year net sales and operating income declines of 4% to 6% and 16% to 18%, respectively.

(Emphasis added.)

51.     Further, Defendant Hankinson expressed continued belief in the Company's "tactical pricing and marketing actions" and ability to meet 2025 full year guidance, stating in relevant part:

Moving on to the Wine and Spirits business. Net sales for the segment declined 12% in the second quarter, driven largely by a 9.8% decrease in shipments. The decline was largely driven by ongoing challenges in the wine category, particularly in the U.S. wholesale marketplace due to both weaker consumer demand and retailer inventory destocking. Accordingly, we remain focused on the ongoing tactical pricing and marketing actions shared at the beginning of this fiscal year to help drive net sales improvement in the performance of our largest brands. As Bill noted, we are seeing some encouraging early results from these actions. And as a reminder, we continue to see the back half of the fiscal year as the higher volume period for our Wine and Spirits business due to historical seasonality related to vintage releases from our higher-end brands and incremental demand over the holiday season, as well as incremental benefits from the initiatives just referenced.
. . .
***Looking forward to the remainder of the year, for the Wine and Spirits business, we expect operating margins to benefit from mix benefits due to the previously noted seasonally driven increase in volumes for our higher-end brands, incremental volume benefits from the commercial execution initiatives also previously referenced to further support demand for our core brands and operational efficiency and cost savings actions similar to those being executed in our Beer business. As we face ongoing operating deleverage due to larger top line headwinds, we anticipate a full year 16% to 18% decline in operating income for our recently revised fiscal '25 guidance.***

(Emphasis added.)

52.    During the question-and-answer portion of the call, Defendants were asked about

the profitability of its Wine and Spirits division:

> <Q: Robert Bain Moskow – TD Cowen – Analyst> I wanted to ask
> about Wine and Spirits. The marketing plans that you had this year,
> it looks like it's been slow to materialize, although you did mention
> some green shoots.
>
> <A: William A. Newlands> Yes. Thanks for the question. So let me
> remind you what Garth and I said at the beginning of the fiscal year,
> that a lot of the work that was put in place was going to take us 9 to
> 12 months to fully play out. And as we said on today's call, we
> expect sequential improvement in the Wine and Spirits business in
> the back half of the year. As we've said and I'll just reiterate one
> more time, we do expect to see sequential improvement in the back
> half of the year based on all the work that's been put in on the first
> half of the year to see that coming along. Noting the point about
> green shoots, we are starting to see some of that result. We look
> forward to seeing more of it in the back half.
>
> <Q: William Joseph Kirk – ROTH MKM Partners – Analyst> I have
> another one on Wine and Spirits. At fiscal year-end, the fair value
> was still estimated, I think, in the 10-K at about $3 billion. The
> impairment takes it down to like $500 million. So I guess why the
> dramatic change in such short time? Why is $500 million the right
> number when it's generating $400 million in EBITDA and there's
> some green shoots out there? And then finally, like does the
> impairment give you any flexibility to do something strategically
> with those assets?
>
> <A: Garth Hankinson > I would say that the amount that remains on
> the balance sheet is -- it's fairly formulaic as you go through what
> you think the future business will look like, there's a number of
> assumptions that will go into that. And so it's -- I think it's important
> to note that it's noncash as well. I wouldn't read anything too much
> into it other than that. And I don't know that it really has any impact
> other than it was an accounting requirement for us to take -- it doesn't
> really change the strategic outlook for the business.

<u>*December 3, 2024*</u>

53.    On December 3, 2024, Defendant Hankinson presented on behalf of Constellation

at the Morgan Stanley Global Consumer & Retail Conference where he reiterated the narrative

that strategic initiatives taken in the wine segment would drive profitability, specifically in the

fourth quarter:

> <Q: Dara Warren Mohsenian – Morgan Stanley – Analyst> And I wanted to touch on Wine and now scale down Spirits business before we end. Obviously, a challenging environment in the wine sector, in general. What's your confidence on the new goals you've outlined recently? And you've had the strategy to shift the portfolio towards the higher end. When do you think that sort of tangibly starts to pay off for you in light of these difficult industry conditions that you're facing?
>
> <A: Garth Hankinson > I mean and as Bill and I laid out at the beginning of the year, we were taking actions, and it was going to take 9 to 12 months before we really saw those actions start to have the tangible results we would all expect. And so we're kind of at that -- we're kind of close to that 9-month mark, if you will, from when we instituted some of the initiatives.
>
> I would say that we're starting to see those initiatives pay off. If we look at brands like Kim Crawford and Sauvignon Blanc and Meiomi and the base pinot noir and the Prisoner Red Blend, the pricing and marketing actions that we took earlier this year are starting to see reflective in the Circana data.
> . . .
> Q4 is always a bigger quarter for us, for the wine industry for a couple of reasons. One has to do with vintage releases, particularly as we've shifted the portfolio to the more premium side of things. A lot of those vintage releases occur in the second half and specifically in Q4. Our direct-to-consumer business sees a pickup in Q4 as a result, not just on the vintage releases but also because of the holidays.
>
> And so certainly, we expect to have the benefits of those in Q4. So again, we're cautiously optimistic around the actions we've taken throughout the year and that those will start to really be more reflective in the results here in Q4 and going into next year.

54.    The above statements in Paragraphs 19 to 53 were false and/or materially

misleading. Defendants created the false impression that they possessed reliable information

pertaining to Constellation's Wine and Spirits business. Contrary to these statements, Defendants

had failed to improve mix, inventory and sales execution and investments made in media spend

and price promotions as well as adjustments in sales capabilities to support distributor partners had not been as effective as they claimed. Consequently, the above statements misled investors by providing the public with materially flawed statements of confidence and growth projections which did not account for these variables.

## **The Truth Emerges**

### *January 10, 2025*

55.     On January 10, 2025, Constellation issued a press release announcing the company's third quarter fiscal year 2025 results, showcasing a significant miss on sales performance in the Beer segment, and an even steeper miss for the Wine & Spirits segment. The press release stated, in pertinent part, that:

> Our Wine and Spirits net sales declined 14% driven by a 16.4% decrease in shipment volumes, mostly driven by ongoing weaker consumer demand and continued retailer inventory destocking across most price segments in the U.S. wholesale market.
>
> The Wine and Spirits Business expects organic net sales decline of 5 - 8% and operating income decline of 17 - 19%

56.     On an earnings call later that day, Defendant Newlands commented on Constellation's disappointing decline in sales and operating income in its wine segment, stating, in pertinent part:

> Conversely, the impact of ongoing consumer demand headwinds in the wine category, particularly in the lower-priced segments and of retailer inventory destocking remain the main drivers of a decline in wine and spirits shipments of 16% year-over-year, which in turn was the primary driver of the respective 14% and 25% declines in net sales and operating income for that business. Our fine wine portfolio, however, achieved depletion growth of 6%. And our largest premium wine brands, Meiomi and Kim Crawford, delivered depletion increases of over 7%. This is aligned with our focus on delivering growth and improving margins by driving our higher-end brands and operating efficiencies while also seeking to deliver value from our mainstream brands.

Against that backdrop, the business remains focused on continuing to advance in several areas. First, the tactical pricing and marketing support actions we are taking in selected markets to accelerate our top 10 largest brands; second, with better alignment with our distributor partners to help improve performance in our largest markets and channels; and third, cost savings and operational efficiency initiatives to drive leverage to the bottom line. In light of continued consumer demand headwinds previously noted, we have updated our fiscal '25 outlook for wine and spirits business to net sales and operating income declines of 5% to 8% and 17% to 19%, respectively.

In closing, we continued to manage a softer consumer backdrop due to macroeconomic headwinds and expect to deliver a very solid fiscal year underpinned by our continued progress against the key growth drivers of our beer business and our proactive actions to improve the performance of our wine and spirits business.

57.    On the same call, Defendant Hankinson commented on the decline in growth in the wine and spirits business, yet still remained confident about the strategic initiatives launched in the beginning of the fiscal year, stating, in relevant part:

Shifting to our wine and spirits business. Net sales declined just over 14% in the third quarter, largely driven by shipment volume decline of over 16%. The volume decline was largely a result of the ongoing category headwinds in the wine category, particularly in the U.S. wholesale market from weaker consumer demand, as well as continued inventory destocking by retailers. ***Despite these persistent challenges, we continue to expect improved organic shipment volume growth performance in our wine and spirits business in the fourth quarter as we anticipate more fully realizing the benefits of the pricing, marketing and distributor initiatives we launched at the beginning of this fiscal year, while also benefiting from the historical seasonal trends of the business.***

(Emphasis added.)

58.    During the question-and-answer segment of the call, Defendant Newlands was asked about the consistent decline of its wine and spirits business:

<Q: Lauren Rae Lieberman - Barclays - Analyst> So just shifting to wine and spirits. I mean, I think it's fair to say we're kind of in

negative -- this ongoing negative revision cycle for that business. So I just -- you called out some of the positives. Maybe you could share a little bit more on like what hasn't gone according to plan? What in the turnaround plan might need tweaks because the hole kind of keeps getting deeper and it doesn't seem like there's many signs, at least from the external standpoint of stabilization.

<A: William A. Newlands> Well, as we said at the beginning of the year, it was going to take us 9 to 12 months and that's about what we're heading into at this point. I think you saw some firm shoots in Q3. Meiomi and Kim Crawford were up 7%. Our craft and depletions, our craft spirits portfolio was up 9%. We continue to be hit very hard at the lower end of the business. The lower end of the business is not healthy. But I think the move that we made relative to SVEDKA is an important example of where we continue to be focusing our business toward the higher end, where we believe there's better growth potential and better margin and profit potential than the lower end of the business. That process is continuing. And we remain optimistic that we're going to continue to see some of these critical brands, those top 10 brands that we're focusing our attention on, continue to see improvement, as you saw with Meiomi and Kim Crawford as an example.

59.     The aforementioned press release and statements made by the Individual Defendants were misleading and in direct contrast to Defendants' prior statements, including those made during the April 11, 2024, May 29, 2024, July 3, 2024, September 3, 2024, October 3, 2024, December 3, 2024 earnings and special investor calls. During these calls, Constellation executives continually touted the Company's progress with regard to its operational and executive initiatives, while detailing plans to improve future growth.

60.     A number of well-known analysts who had been following Constellation lowered their price targets in response to the Company's disclosures. J.P. Morgan analyst commented on Constellation's earnings miss and lowering of EPS guidance for fiscal year 2025 stating, "[w]e believe results disappointed even this lower bar, especially compared with what sounded like a more constructive tone at a recent conference presentation in early December (STZ F3Q ended November) by management."

61.     Similarly, Jefferies analyst commented on Constellation's disappointing third quarter results, stating, "Beer margins -59bp, worse than expected and W&S trends worsened. Guidance was lowered for all divisions, but still implies Beer and W&S trends improve - we're not sure."

62.     The fact that these analysts, and others, discussed Constellation's below par earnings and revenue suggests the public placed significant weight on Constellation's statements of prior confidence in its ability to deliver increased profitability and growth, specifically in its Wine and Spirits division. The frequent, in-depth discussion of Constellation's guidance confirms that Defendants' statements during the Class Period were material.

63.     As a result, investors and analysts reacted immediately to Constellation's revelations. The price of Constellation's common stock declined dramatically. From a closing market price $219.28 per share on January 8, 2025 to $181.81 per share on January 10, 2025.

### Loss Causation and Economic Loss

64.      During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Constellation's common stock and operated as a fraud or deceit on Class Period purchasers of Constellation's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Constellation's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Constellation's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

65.    Constellation's stock price fell in response to the corrective event on January 8, 2024, as alleged *supra*. On January 8, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Constellation's forecasting processes and growth guidance

66.    In particular, on January 8, 2024, Constellation announced significantly below estimated earnings and revenue for fiscal year 2025. This projection was well below the market expectations generated by Constellation's own previous reports of economic growth and internal growth projections provided throughout the first half of the fiscal year 2025.

**Presumption of Reliance; Fraud-On-The-Market**

67.    At all relevant times, the market for Constellation's common stock was an efficient market for the following reasons, among others:

(a)    Constellation's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Constellation communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Constellation was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage

firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Constellation was reflected in and incorporated into the Company's stock price during the Class Period.

68.    As a result of the foregoing, the market for Constellation's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Constellation's stock price. Under these circumstances, all purchasers of Constellation's common stock during the Class Period suffered similar injury through their purchase of Constellation's securities at artificially inflated prices, and a presumption of reliance applies.

69.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

70.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in

sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

71.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

72.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Constellation who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Constellation's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

74.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Constellation's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Constellation or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of December 31, 2024, there were approximately 180,704,555 shares of Class A common stock and 25,777 shares of Class 1 common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

75.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

76.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Constellation;

(c) whether the Individual Defendants caused Constellation to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Constellation's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

78. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of* *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

79. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

81.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Constellation common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Constellation's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

82.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Constellation's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

83.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

84.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Constellation's internal affairs.

85.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Constellation's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Constellation's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Constellation's common stock at artificially inflated prices and relied upon the price of the

common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

86.    During the Class Period, Constellation's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Constellation's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Constellation's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Constellation's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

87.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

88.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

89.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Constellation's misstatements.

91.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Constellation which had become materially false or misleading.

92.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Constellation disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Constellation to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Constellation's common stock.

93.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same

to cause Constellation to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

94.    By reason of the above conduct, the Individual Defendants and/or Constellation are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 18, 2025                    Respectfully submitted,

                                            _/s/ Daniel Tepper_____
                                            **LEVI & KORSINSKY, LLP**
                                            Daniel Tepper
                                            Adam M. Apton (*pro hac vice* forthcoming)
                                            33 Whitehall Street, 17th Floor
                                            New York, New York 10004
                                            Tel.: (212) 363-7500
                                            Fax: (212) 363-7171
                                            Email: dtepper@zlk.com
                                            Email: aapton@zlk.com

                                            *Attorneys for Plaintiff*