**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MACARIA MEZA, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>  v.<br><br>CONSTELLATION BRANDS, INC., BILL NEWLANDS, and GARTH HANKINSON,<br><br>       Defendants. | Case No. 6:25-cv-6107-EAW<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

I.      INTRODUCTION. ................................................................................................ 1

II.     STATEMENT OF FACTS. ................................................................................ 3

        A.    STZ was Prized by Investors for its High Year-Over-Year Beer Growth Rate...... 3

        B.    Defendants Closely Monitored their Key Hispanic Consumers. ........................... 3

        C.    By April 2024, STZ Began Experiencing Severe Headwinds. ............................... 4

        D.    April-May 2024: The Class Period Begins with Defendants Issuing their FY2025
              Guidance and Assuring the Market of STZ's Consumers' Health. ........................ 5

        E.    July-August 2024: Defendants Reaffirm the FY2025 Guidance. ........................... 6

        F.    September 3, 2024: Defendants Reduced STZ's FY2025 Guidance...................... 7

        G.    October 3, 2024: STZ's Q2 2025 Results Miss the Markets' Expectations. .......... 8

        H.    November - December 2024: Defendants Continue to Conceal the True Impact of
              Economic Slowdown on STZ. ............................................................................. 9

        I.    January 10, 2025: Defendants Reveal the Truth about their Consumers and the
              Macroenvironment's Impact on STZ's Guidance and Q3 2025 Results. .............. 9

III.    STANDARDS OF LAW. ................................................................................... 10

IV.     ARGUMENT. .................................................................................................... 11

        A.    Defendants Impermissibly Submit Materials Outside the Pleadings; Fed R. Civ. P.
              12(d) Requires Exclusion or Conversion of the Motion. .................................... 11

1. Defendants' Improperly Rely on the Exhibits for the Truth of the Matters Asserted to Create Issues of Fact with Plaintiffs' Allegations. ...................... 13

2. Defendants' Motion Improperly Relies on Extra-Pleading Documents for the Truth of the Matter Asserted without Any Request for Judicial Notice ......... 16

3. The Exhibits Must Be Excluded, or If Considered, the Motion to Dismiss Must Be Converted to a Motion for Summary Judgment. ...................................... 17

B. The Amended Complaint Adequately Alleges the Misstatements are False, Misleading and Actionable. .................................................................. 18

1. Defendants' Financial Projections are Not Protected by the Safe Harbor, were Knowingly False as Defendants were Aware of Material Undisclosed Facts that Undermined the Projections....................................................... 18

2. Defendants' Statements on Consumer Health and Shifting Behaviors Were False. ................................................................................................. 25

3. Defendants' "Opinion" Statements Are Actionable Because They Omitted Known, Contradictory Facts. .......................................................... 28

C. The Amended Complaint Pleads a Strong Inference of Scienter. ....................... 30

1. Defendants' $25 Million in Suspicious Insider Sales Show a Motive for Fraud. .................................................................................................. 30

2. Plaintiffs Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness. ................................................................................... 34

D. The Amended Complaint Adequately Pleads Loss Causation. ........................... 38

E.      The Amended Complaint Adequately Alleges a Violation of §20(a)................... 40

V.      CONCLUSION........................................................................................................ 40

## TABLE OF AUTHORITIES

**Cases**

*In re Alphabet, Inc. Sec. Litig.,*

  1 F.4th 687, 704 (9th Cir. 2021)......................................................................... 19

*In re AppHarvest Sec. Litig.,*

  684 F. Supp. 3d 201 (S.D.N.Y. 2023)........................................................... 14, 25

*In re Apple Inc. Sec. Litig.,*

  No. 19-CV-02033-YGR, 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)................................... 34

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*

  324 F. Supp. 2d 474 (S.D.N.Y. 2004)................................................................. 35

*Ashcroft v. Iqbal,*

  556 U.S. 662 (2009) .................................................................................. 10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*

  493 F.3d 87 (2d Cir. 2007)............................................................................ 30

*In re Avon Sec. Litig.,*

  No. 19 CIV. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ............................... 35

*In re Barclays Liquidity Cross & High Frequency Trading Litig.,*

  390 F. Supp. 3d 432 (S.D.N.Y. 2019).................................................................. 30

*Bell Atl. Corp. v. Twombly,*

  550 U.S. 544 (2007) .................................................................................. 10

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*

  750 F.3d 227 (2d Cir. 2014)........................................................................... 38

*Chambers v. Time Warner, Inc.*,

    282 F.3d 147 (2d Cir. 2002) ..................................................................... 11

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,

    477 F. Supp. 3d 123 (S.D.N.Y. 2020) ..................................................... 30

*DiFolco v. MSNBC Cable L.L.C.*,

    622 F.3d 104 (2d Cir. 2010) ..................................................................... 11

*In re DraftKings Inc. Sec. Litig.*,

    650 F. Supp. 3d 120 (S.D.N.Y. 2023) ..................................................... 22

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,

    794 F.3d 297 (2d Cir. 2015) ......................................................... 25, 30, 34

*In re EVCI Colleges Holding Corp. Sec. Litig.*,

    469 F. Supp. 2d 88 (S.D.N.Y. 2006) ....................................................... 32

*Frankfurt-Trust Investment Luxemburg AG v. United Techs. Corp.*,

    336 F. Supp. 3d 196 (S.D.N.Y. 2018) ..................................................... 23

*Freudenberg v. E\*Trade Fin. Corp.*,

    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................... 28, 31

*Friedl v. City of New York*,

    210 F.3d 79 (2d Cir. 2000) ........................................................ 12, 13, 14, 17

*In re Galena Biopharma, Inc. Sec. Litig.*,

    117 F. Supp. 3d 1145 (D. Or. 2015) ........................................................ 34

*Ganino v. Citizens Utilities Co.*,

    228 F.3d 154 (2d Cir. 2000) ............................................................... 30, 40

*Gimpel v. The Hain Celestial Grp., Inc.,*

    156 F.4th 121 (2d Cir. 2025).................................................................... 27, 33, 38

*Glantz v. James River Grp. Holdings, Ltd.,*

    No. 23-CV-10000 (LJL), 2025 WL 278440 (S.D.N.Y. Jan. 23, 2025)..................................... 14

*In re Glenayre Technologies, Inc. Sec.Litig.,*

    No. 96 CIV. 8252(HB), 1998 WL 915907 (S.D.N.Y. 1998), *aff'd*, 201 F.3d 431 (2d Cir. 1999)

    ............................................................................................... 32

*Global Network Commc'ns, Inc. v. City of New York,*

    458 F.3d 150 (2d Cir. 2006)..................................................................... 12

*Goel v. Bunge, Ltd.,*

    820 F.3d 554 (2d Cir. 2016).............................................................. 11, 12, 17

*In re Hi-Crush Partners L.P. Sec. Litig.,*

    No. 12 CIV. 8557 CM, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013)....................................... 35

*Kempen Int'l Funds v. Syneos Health, Inc.,*

    23-cv-8848 (AS), 2024 WL 1805011 (S.D.N.Y. Apr. 25, 2024)............................................ 18

*Khoja v. Orexigen Therapeutics, Inc.,*

    899 F.3d 988, 998 (9th Cir. 2018)................................................................ 13

*Kleinman v. Elan Corp.,*

    706 F.3d 145 (2d Cir. 2013)..................................................................... 12

*Kramer v. Time Warner Inc.,*

    937 F.2d 767 (2d Cir. 1991).................................................................. 11, 12

*Lee v. Springer Nature Am., Inc.,*

    769 F. Supp. 3d 234 (S.D.N.Y. 2025)............................................................. 13

vi

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*

797 F.3d 160 (2d Cir. 2015).................................................................................... 38

*Malin v. XL Cap. Ltd.,*

499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) ....................... 23

*Meyer v. Jinkosolar Holdings Co.,* 7

61 F.3d 245 (2d Cir. 2014)............................................................................... 27, 28

*In re MF Global Holdings Ltd. Sec. Litig.,*

982 F.Supp.2d 277 (S.D.N.Y. 2013).......................................................................... 19

*Nguyen v. New Link Genetics Corp.,*

297 F. Supp. 3d 472 (S.D.N.Y. 2018), *aff'd in part,* v*acated in part, remanded sub nom.*

*Abramson v. Newlink Genetics Corp.,* 965 F.3d 165 (2d Cir. 2020) ........................... 31, 32, 34

*Novak v. Kasaks,*

216 F.3d 300 (2d Cir. 2000)............................................................................... 22, 24

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.,*

367 F. Supp. 3d 16 (S.D.N.Y. 2019)....................................................................... 27

*Omnicare, Inc. v. Laborers Dist. Council,*

575 U.S. 175 (2015) ........................................................................................ 20

*In re Omnicom Grp., Inc. Sec. Litig.,*

597 F.3d 501 (2d Cir.2010)................................................................................. 38

*In re Oxford Health Plans, Inc.,*

187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................... 29, 32, 33

*In re Romeo Power Inc. Sec. Litig.,*

No. 21 CIV. 3362 (LGS), 2022 WL 1806303 (S.D.N.Y. June 6, 2022).................................. 36

*Roth v. Jennings*,

    489 F.3d 499 (2d Cir. 2007) ................................................................................. 11

*S. Ferry LP # 2 v Killinger*,

    687 F. Supp. 2d 1248 (W.D. Wash. 2009) ............................................................ 36

*In re Salomon Analyst AT&T Litig.*,

    350 F. Supp. 2d 455S.D.N.Y. 2004) ..................................................................... 39

*In re Scholastic Corp. Sec. Litig.*,

    252 F.3d 63 (2d Cir. 2001) ............................................................................. 19, 31

*In Re Shanda Games Ltd. Sec. Litig.*,

    128 F.4th 26 (2d Cir. 2025)*, cert. denied sub nom. Shanda Games Ltd. v. Monk,* No. 25-351,

    2025 WL 3131847 (U.S. Nov. 10, 2025) .............................................................. 29

*In re Signet Jewelers Ltd. Sec. Litig.*,

    No. 16 CIV. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ........................... 20, 39

*Sills v. United Nat. Foods, Inc.*,

    No. 23-CV-2364 (JGLC), 2024 WL 4188324 (S.D.N.Y. Sept. 13, 2024 ........................... 25, 36

*Singh v. Cigna Corp.*,

    918 F.3d 57 (2d Cir. 2019) ................................................................................... 27

*Slayton v. Am. Exp. Co.*,

    604 F.3d 758, 772 (2d Cir. 2010) ........................................................................ 19

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,

    No. 22-CV-6978 (AS), 2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ................................. 32, 37

*Staehr v. Hartford Fin. Servs. Group, Inc.*,

    547 F.3d 406 (2d Cir. 2008) ................................................................................. 12

*Sterling v. Deutsche Bank Nat'l Tr. Co.*,

    2023 U.S. Dist. LEXIS 52010 (S.D.N.Y. Mar. 27, 2023) ........................................ 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

    551 U.S. 308 (2007) ................................................................................... 11, 30

*Tongue v. Sanofi*,

    816 F.3d 199 (2d Cir. 2016) ..................................................................... 29

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,

    625 F. Supp. 3d 164 (S.D.N.Y. 2022) ..................... 20*Univ. Health Servs., Inc. v. United States*,

    ⸺ U.S. ⸺, 136 S.Ct. 1989 (2016) ................................................... 27

*In re Vivendi, S.A. Sec. Litig.*,

    838 F.3d 223 (2d Cir. 2016) ..................................................................... 27

*In re Xerox Corp. Sec. Litig.*,

    165 F. Supp. 2d 208 (D. Conn. 2001) ..................................................... 31

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.*,

    No. 23-CV-431, 2024 WL 451691 (S.D.N.Y. Feb. 5, 2024). ................... 38

*zCap Equity Fund LLC v. LuxUrban Hotels Inc.*,

    792 F. Supp. 3d 407 (S.D.N.Y. 2025), *reconsideration denied*, No. 24 CIV. 1030 (PAE), 2025

    WL 2962772 (S.D.N.Y. Oct. 21, 2025) ................................................... 35

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A) ......................................................................... 30

15 U.S.C. § 78u-5(c)(1)(B) ................................................................... 18, 19

**Rules**

17 C.F.R. § 240.10b-5(b) ................................................................................................. 27

FED. R. CIV. P. 12(d) ................................................................................................. 12, 17

FED. R. EVID. 201(b) ...................................................................................................... 12

FED. R. EVID. 201(c)(2) .................................................................................................. 11

## I.    INTRODUCTION.

This case arises from Defendants' deliberate fraud to mislead investors about the rapidly deteriorating state of customer demand and sales within the beer business of Constellation Brands, Inc. ("STZ")[1] throughout 2024. Throughout the Class Period, while Defendants publicly assured the market that consumer demand was strong and that the company was "relatively immune" to economic pressures, they were internally aware of significant, adverse macroeconomic trends that were negatively impacting their core consumer base and causing sales to falter. As these headwinds mounted, Individual Defendants Bill Newlands (CEO) and Garth Hankinson (CFO) sold over $25 million of their personally held STZ stock at artificially inflated prices. Only after these insider sales were complete did Defendants reveal the true extent of STZ's struggles, causing its stock price to plummet and resulting in billions of dollars in losses for Plaintiffs and other investors.

In response to Plaintiffs' well-pleaded allegations, Defendants have filed a "motion to dismiss" that is simply a motion for summary judgment in a rather thin disguise. The memorandum of law with its argumentative "appendices" is 98 pages long (almost as long as the Amended Complaint itself and over twice as long as the Court-authorized 40-page limit) and is accompanied by 32 exhibits that add a further 1054 pages to Defendants' arguments. In support of their "motion", Defendants submit an alternative version of the facts and ask the Court to determine factual disputes in their favor on a completely one-sided discovery record. This is patently improper. The Court should not approve this blatant abuse of the Rules of Civil Procedure and its own control of proceedings and exercise its discretion to deny the motion for failure to comply

---

[1] All capitalized terms shall have the meaning ascribed to them in the Amended Complaint For Violations Of The Federal Securities Laws (the "Amended Complaint" or "AC", ECF No. 26) unless otherwise ascribed herein.

1

with its order and the Local Rules. Any complaint that requires nearly 1,200 pages of submissions from Defendants to try to defend is patently adequately pleaded and entitles Plaintiffs to proceed to discovery to rebut Defendants' arguments.

On the merits, despite the volume of Defendants' submissions, the Amended Complaint adequately alleges fraud claims. The Amended Complaint adequately alleges that Defendants' statements were material misrepresentations of present fact directly contradicted by adverse information known internally at STZ. The Amended Complaint pleads that Defendants knew their core Hispanic consumers were exhibiting value-seeking behaviors that made their aggressive growth targets unattainable yet repeated it to investors anyway. Although Defendants did slightly revise this guidance on September 3, 2024, the truth was not fully revealed until January 10, 2025 when analysts were blindsided by a significant revision of guidance. Defendants delayed revealing the full truth and impact of these negative trends because it allowed Individual Defendants Newlands and Hankinson to sell over $16 million of their personally held STZ stock at artificially inflated prices. ¶¶118-121, 210-216. Finally, the Amended Complaint establishes a strong inference of scienter by pleading specific, contemporaneous facts, including a confidential witness's account that by June 2024 it was "common knowledge" the company would miss its plan, internal reports of sales "hitting the wall," the concealment of deteriorating performance in untracked channels, the suspiciously timed multi-million-dollar insider sales, and Defendants' own post-class period admissions. For the reasons stated here, Defendants' motion to dismiss the Amended Complaint should be denied in its entirety.

## II.    STATEMENT OF FACTS.

### A.    STZ was Prized by Investors for its High Year-Over-Year Beer Growth Rate.

STZ is a leading international producer and marketer of beer, wine, and spirits. ¶4.[2] STZ's financial success is primarily driven by its high-performing beer portfolio, which it exclusively imports, markets, and sells in the United States. ¶17. This portfolio, which comprises approximately 84% of net sales and, as Defendant Newlands stated on May 29, 2024, over 85% of total profit, includes popular Mexican brands such as Modelo Especial and Corona Extra, which have been the top-selling imported beers and significant drivers of growth in the U.S. beer market. ¶¶17-20.

Analysts and investors prized STZ as a "growth story" in an otherwise mature beer market, making the rate of its growth the central metric of concern. ¶¶50-51. While the overall beer market was viewed as beleaguered, STZ was considered a "bright spot" specifically because of its "growth story," which was centered on its year-over-year ("YoY") beer sales growth rate. ¶52. As such, STZ's valuation was dependent on its ability to achieve its beer growth algorithm, i.e. its projected net sales growth percentage. ¶¶49, 50. An April 12, 2024 report from Truist Securities stated this explicitly: "The only metrics that investors are focused on for STZ is beer sales growth and beer depletions and the positive guide for FY25 beers sales growth is what is propelling the stock today." ¶53. Any failure to meet the 7-9% growth rate promised in STZ's algorithm was a material failure to meet the market's core expectation. ¶¶53, 62.

### B.    Defendants Closely Monitored their Key Hispanic Consumers.

STZ's financial performance hinges on specific consumers within just five key markets—California (its largest and most critical market), Texas, Florida, New York, and Illinois—which

---

[2] All citations to "¶" are paragraph citations to the Amended Complaint.

Defendants acknowledged account for "roughly half" of the company's business. ¶¶21-23, 74, 125. Within these markets, STZ's performance is inextricably tied to Hispanic consumers, which Defendant Newlands stated on November 2, 2023, as "the single most important consumer group for our business," representing over 50% of its total beer volume. ¶¶22, 23, 42.

Throughout the Class Period, Defendants repeatedly assured investors of their deep, "on-the-ground" investment in market intelligence, particularly concerning their core Hispanic consumer. ¶¶31, 44, 45, 47. They extolled their practice of closely tracking macroeconomic factors, consumer sentiment, and behavioral trends (*e.g.*, ¶¶35, 45, 47), affirming that STZ conducts "a fair amount of research" on this consumer base, watching it "very closely" down to the "ZIP codes that are heavy Hispanic ZIP codes." ¶¶39-40, 43.

This tracking gave Defendants exclusive, non-public knowledge of the two halves of their business: the publicly tracked channels (major retailers measured by market research firms such as Circana) and the untracked channels (independent convenience and liquor stores). ¶¶43, 166, 185. These untracked channels are a critical barometer of the core Hispanic consumer, making the concealment of their poor performance particularly material. ¶¶43, 166, 185. STZ also monitors and reports data on its "shipments", the volume of product shipped from its breweries, wineries, and distilleries to distributors, and "depletions", shipments of STZ branded products by distributors to retail customers. ¶29.

**C. By April 2024, STZ Began Experiencing Severe Headwinds.**

At the beginning of the Class Period, severe macroeconomic pressures began affecting the beer industry and large beer brands especially. ¶¶54-66. RBC reported on May 28, 2024 that "low income consumers over-index to large beer brands and Hispanic unemployment [was] rising faster

than national average." ¶54. Increases in unemployment and other economic trends were leading to a decline in low-income customer buy rates, especially among Hispanic consumers. ¶¶57-61.

CW1, a former Senior Director of Trade Marketing – Beer, at STZ from 2020 to June 2024, confirmed STZ saw the impact of the economic headwinds on its own sales. According to CW1, it was "clear from business reporting" and "common knowledge" within the Beer Division by June 2024 that STZ was "on track to miss the initial plan for F2025" because they were already "behind" their forecasts. ¶¶71, 76. STZ's own internal monthly "Drags and Drivers" reports detailed these slowdowns. ¶¶72-75. Critically, CW1 heard STZ's Chief Marketing Officer state that sales in California—its largest market and "canary in the coalmine"—were "hitting the wall." ¶¶71-72, 74. Moreover, CW1 confirmed that that not just sales of Corona had been declining, in particular in the critical California markets, but Modelo had also been slowing down. This is consistent with the sales data reported by RBC in its May 28, 2024 report. ¶55. CW1 noted that by August, STZ typically had "a very clear" picture of how the remainder of the fiscal year (March to February) would perform as beer sales tend to be heavier during summer months. ¶71-77. CW1 noted it was unique in his 13 years of experience at STZ to miss its internal plan goals in 2024. ¶¶70. Ultimately, CW1 learned that STZ missed its internal goals for 2025 by over 13 million cases of beer, or 6.5% of its annual beer sales. ¶79. Defendant Hankinson corroborated CW1 by confirming that STZ began seeing the effect of a decline in Hispanic employment by May 2024 and this effect persisted through to February 2025 and beyond. *See*, *e.g.*, ¶¶88, 166, 209.

**D. April-May 2024: The Class Period Begins with Defendants Issuing their FY2025 Guidance and Assuring the Market of STZ's Consumers' Health.**

Despite observing a slowdown in sales growth due to the economic headwinds, Defendants publicly represented that STZ sales were growing robustly and were immune from the economic

5

trends affecting the overall beer industry. On April 11, 2024, Defendants issued their FY2025 guidance, projecting 7-9% beer net sales growth, and Defendant Newlands stated, "We're very pleased with the health of our consumer." ¶¶81, 87. On April 12, 2024, he added, "we have been relatively immune" to consumer caution. ¶91. RBC in its May 28, 2024 report concluded that its "'Outperform thesis on STZ hinges on its ability to deliver 7-9% top line growth... and that view has not changed despite the recent slowdown.'" ¶¶61-62.

Defendants continued to assure analysts and the markets of the strength of STZ's sales and the achievability of its FY2025 guidance. On May 29, 2024, in response to a question on the "strength of the American consumer" and whether there was any "downgrading," Defendant Newlands stated "we're very pleased with where the consumer is", that Defendants "haven't seen a lot of pressure on the brands", that "unemployment is at a traditionally low rate compared to what we've seen in the last several years" with STZ benefitting from "a lot of tailwinds" in the Hispanic community and as such they were "seeing a lot of things that are very positive about our brands" that was "perhaps a little different than what some people are seeing relative to the category." ¶97.

**E. July-August 2024: Defendants Reaffirm the FY2025 Guidance.**

On July 3, 2024, after it was known internally that the beer business sales were experiencing declines and "hitting the wall," Defendants held their Q1 2025 Earnings Call. On the call Defendants, reaffirmed the 7-9% net sales growth guidance (¶104) and Defendant Newlands stated, "our top line performance is sustainable." (¶108). Defendant Hankinson attributed this in no small part to the "demographic tailwinds from Hispanic consumers" which he said "give us further assurance that our top line performance is sustainable". ¶108. Even though on July 3, 2024, Defendants noted that there was not an absence of 'some consumer shift in pack sizes,' they

6

insisted STZ's beer business "continues to excel despite whatever might be going on with other beer companies or with other brands in the sector" (¶109) and did not acknowledge any "big channel shifts," rather noting that Hispanic consumers' buy rates were stronger than the total consumer segment (¶110).

These statements were materially false and misleading, however, because at that time, Defendants failed to disclose that the 7-9% guidance was unachievable based on the known internal data. ¶¶71, 76, 112-113. Defendants also misleadingly downplayed consumer issues, omitting the material fact that their core consumers were under significant strain and shifting purchases in ways that were actively harming the business. ¶¶54, 60, 113. Six weeks later, on or about August 15, 2024, Defendant Hankinson continued the deception, conveying a "simple" message to Wells Fargo that the *"sky is not falling ('if we saw something, we'd update the market')."* ¶117. Notwithstanding, Defendant Hankinson sold 35,856 shares on August 8, 2024, approximately a week before the Wells Fargo report, netting him a massive profit of approximately $8.639 million. ¶216.

### F. September 3, 2024: Defendants Reduced STZ's FY2025 Guidance.

Just three weeks later, on September 3, 2024, Defendants announced their first downward revision to the FY2025 guidance, marginally lowering beer net sales growth from the coveted 7-9% growth rate to 6-8%. ¶120. Defendants attributed this change to "incremental macroeconomic headwinds affecting consumer" noting an "uptick" in the unemployment rate but again failing to describe the impact of STZ's Hispanic channel shifts on STZ's revised guidance. ¶¶121, 125. While acknowledging some impact from "[i]ncremental macroeconomic headwinds" (¶121) Defendants stressed the "transitory" nature of the impact, the "business remains very, very, strong", and that STZ was "looking forward to a good back half of the year." ¶125.

7

The market response to the guidance reduction was positively received by investors and analysts with JP Morgan noting that the lowering of the guidance was "not a surprise" to it given the continued "deceleration in Beer tracked channel data" and noting that the stock price reactions were positive as Defendants' statements were "consistent with prior commentary, the company is only seeing marginal shifts in package/channel mix to value oriented options", and that investors were "likely pleased that the reduction is relatively small and likely points to better trends in channels and/or geographies not as well covered by NielsenIQ or Circana" (*i.e.*, the untracked channels). ¶129. Other analysts remained confident in STZ's ability to maintain strong sales growth. ¶¶130-36.

**G.  October 3, 2024: STZ's Q2 2025 Results Miss the Markets' Expectations.**

On October 3, 2024, STZ disclosed Q2 2025 results that missed market expectations for depletions, revealing for the first time that the "macroeconomic backdrop" and "rising unemployment rates" had in fact materially "impacted consumer behavior." ¶143. In the press release announcing the financial results, Defendants reiterated its 6-8% net sales growth for beer guidance. ¶140. During the Q2 2025 earnings call, Defendant Hankinson noted consumers were seeking "more value-oriented packs and channels," but immediately neutralized this negative fact by deceptively calling the headwinds "transitory in nature" and stated it as "purely a near-term issue." ¶¶143, 145, 146. This partial disclosure, which contradicted Defendants' prior assurances of consumer "health" and "immunity" to these issues resulted in a depletions rate that missed analysts' and the markets' expectations which caused STZ's stock to fall $12.02 per share, or 4.7%. ¶153. Notwithstanding, Defendants reiterated their most recent guidance. Defendants continued to conceal material information to disclose the continued impact that these trends were already having on current guidance and STZ's Q3 2025 financial results, which as of October 3,

2024 was already over one-third through the quarter. ¶¶140, 152. Notably, from October 29, 2024 to November 14, 2024, Newlands sold 32,426 shares for over $7.8 million in proceeds. *See* ¶211.

**H. November - December 2024: Defendants Continue to Conceal the True Impact of Economic Slowdown on STZ.**

On December 3, 2024, just three days after STZ's third quarter had closed on November 30, 2024, Defendant Hankinson, who possessed the actual, disappointing results for that quarter (¶164), discussed at the December 3, 2024 Morgan Stanley Conference that there were still "reasons for optimism" including the "transitory" nature of the headwinds and because the "macroeconomic backdrop hasn't gotten worse." ¶¶165, 172. However, this was a material misrepresentation as Hankinson omitted the most important fact: that the actual, non-public results from the just-closed quarter proved the headwinds were neither minor nor transitory, but were actively damaging STZ's performance. ¶¶167, 181, 184. Moreover, Hankinson later admitted that Defendants knew at least as early as the second fiscal quarter 2025 - that started on June 1, 2024 - that "consumers were shifting towards mass merchants and clubs to value seek" ¶¶166-67. Again, analysts were misled, accepting these statements and concluding that the "summer beer slowdown appears to have been transitory in nature." ¶¶168-169, 171.

**I. January 10, 2025: Defendants Reveal the Truth about their Consumers and the Macroenvironment's Impact on STZ's Guidance and Q3 2025 Results.**

Finally, on January 10, 2025, Defendants could no longer conceal the full impact of the issues they had downplayed for months. ¶173. STZ announced it was again slashing its FY2025 guidance, this time far more dramatically. ¶¶174, 178, 180. It was only on this date that they finally disclosed the true impact and duration of the problems. ¶180. Defendants admitted to a significant "headwind from unfavorable mix as consumers continued to shift to value-oriented larger pack

size," a problem they now admitted was "prolonged", and a collapse in their untracked channels of "independent retailers... not captured in Circana data." ¶¶182, 184, 185. Newlands conceded that "the length of the near-term moves has been a little longer than what we had anticipated," directly contradicting his earlier "transitory" characterizations. ¶188. Newlands also revealed that the Q3 results would have been worse if not for "incremental marketing investments" Defendants deployed to counteract the softness. ¶181.

Following these final revelations of the true, severe, and prolonged impact of the headwinds, STZ's stock price collapsed by nearly 18%, erasing billions in shareholder value. ¶189. Analysts reacted with shock. ¶¶191-194, 202. Roth Capital Partners said "the sudden Beer profitability pressure is a surprise, particularly after Beer profitability guidance was raised in September." ¶193. A JPMorgan analyst was likewise "surprised by the magnitude of the guidance cut," specifically highlighting that the issues were now described as "more prolonged," which directly contradicted Defendants' earlier "transitory" assurances. ¶194. The analyst reactions, including frustration at the dramatic "change in tone relative to a month ago," confirm that this was the moment the full truth—and the corresponding loss—was revealed to the market. ¶202. Following these revelations, STZ's stock price collapsed by $37.47 per share, or 17.9%. ¶189.

## III. STANDARDS OF LAW.

To defeat a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausibly alleged "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating a motion to dismiss, the court must accept as true all factual allegations and draw all

10

reasonable inferences in plaintiff's favor. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

## IV.     ARGUMENT.

### A. Defendants Impermissibly Submit Materials Outside the Pleadings; Fed R. Civ. P. 12(d) Requires Exclusion or Conversion of the Motion.

In contravention of Second Circuit law, Defendants' motion to dismiss submits numerous documents to the Court that may not be considered at this stage. The rule is clear: "consideration of a Rule 12(b)(6) motion is limited to the factual allegations in the complaint, documents attached to the complaint as exhibits or incorporated in it by reference, to matters of which judicial notice might be taken, or to documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (cleaned up) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)). Narrow exceptions permit the Court to consider documents (i) attached to the complaint, (ii) incorporated by reference, or (iii) "integral" to the complaint because the complaint relied "on the terms and effect of [the] document in drafting the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). But "mere notice or possession" of a document is not enough. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). For judicial notice to be taken of party-submitted documents, the party must request that the Court notice it and the Court must be supplied with the necessary materials. FED. R. EVID. 201(c)(2); *Sterling v. Deutsche Bank Nat'l Tr. Co.*, 2023 U.S. Dist. LEXIS 52010, at *10-11 (S.D.N.Y. Mar. 27, 2023).

Even when a document is judicially noticed or considered, the Court *may not accept it for the truth of the matters asserted to resolve factual disputes* on a motion to dismiss. *Global Network*

*Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (court erred by relying on extra-pleading material to decide disputed facts); *Kramer*, 937 F.2d at 774 (SEC filings considered to determine "what the documents stated," not to prove the truth of those statements); *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). If matters outside the pleadings are submitted to and not excluded by the Court, Rule 12(d) mandates "the motion must be treated as one for summary judgment," and the parties must be given "a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d); *see also Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000); *Goel*, 820 F.3d at 559.

Here, the motion to dismiss submits numerous documents not attached to, and neither incorporated by nor integral to the pleadings, and does not request judicial notice, instead arguing that the Court may consider the materials for the truth of the matters they assert. Even without a request for judicial notice, the materials submitted by Defendants touch on factual matters that Plaintiffs dispute and Defendants submit the materials for the truth of the matters they assert, falling afoul of both FED. R. EVID. 201(b) and the Second Circuit's established law regarding the submission and consideration of materials outside the pleadings. For this reason, the Motion to Dismiss should be converted to a motion for summary judgment, as required by Rule 12(d) or, alternatively, the materials and the arguments that relied upon them should be excluded. FED. R. CIV. P. 12(d); *Friedl*, 210 F.3d at 83 (noting that "this conversion requirement is strictly enforced whenever there is a 'legitimate possibility' that the district court relied on material outside the complaint in ruling on the motion."). The rule is strict, as the Second Circuit has recognized that when a court fails to comply with the rule that "[v]acatur is required even where the court's ruling simply 'mak[es] a connection not established by the complaint alone' or contains an 'unexplained

reference' that 'raises the possibility that it improperly relied on matters outside the pleading in granting the defendant's Rule 12(b) motion.'" *Id.* (citations to quoted text omitted).

### 1. Defendants' Improperly Rely on the Exhibits for the Truth of the Matters Asserted to Create Issues of Fact with Plaintiffs' Allegations.

Defendants' reliance upon the 32 exhibits ("Exhibits", ECF Nos. 31-1 - 31-32) filed in support of their motion is a "concerning pattern in securities cases like this one: exploiting [judicial notice and incorporation by reference] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). "If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Id*. at 899*; see Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 248 (S.D.N.Y. 2025) (citing *Orexigen* and concluding "the Court cannot rely on the factual averments of counsel in support of the motion."). Nonetheless, Defendants rely on the Exhibits and the appendices (ECF Nos. 31-1, 31-2, 31-3, the "Appendices") derived therefrom to rewrite their statement of facts titled "Background" (Defs. Br. 3-13)[3] and in support of their arguments throughout. *See* Defs. Br.; Declaration of Amal El Bakhar (ECF No. 30). Over these ten pages of "Background", Defendants rely almost exclusively on the Exhibits and the Appendices, as opposed to the Amended Complaint. Defs. Br. 3-13.

Defendants use their version of the facts, as opposed to those alleged in the Amended Complaint, to argue merits propositions and create factual issues to *contradict* the Amended

---

[3]Memorandum of Law in Support of Defendants' Motion to Dismiss the Plaintiffs' Amended Complaint (ECF No. 31, "Defs. Br.").

13

Complaint's well-pleaded facts and to make their own factual case for dismissal. There is no question that Defendants are using their Exhibits for the truth of the matters they assert. *See, e.g.,* Defs. Br.; *id.* at 17-18 (arguing that data and statements in analyst reports render Plaintiffs' allegations false); *id.* at 19 (citing to Background § F and arguing that CW1's statements are incorrect because "[i]ndeed, Constellation's national Beer sales in tracked channels were robust"); *id.* at 23 (citing to Background § D and arguing alleged misstatements are not false because RBC's data showed "growing volumes" and Jefferies reports "support Defendants' opinions and optimism on consumers at this time"); *id.* at 24 (citing to Background §§ F-H which relies almost exclusively on Defendants' Exhibits). Even if "[t]hey are therefore deemed incorporated by reference such that the Court may consider the documents for their contents and the fact that they were filed" it may not consider them "for their truth." *Glantz v. James River Grp. Holdings, Ltd.,* No. 23-CV-10000 (LJL), 2025 WL 278440, at *5 (S.D.N.Y. Jan. 23, 2025)*; In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 238 (S.D.N.Y. 2023) ("The Court may also properly consider these documents in ruling on the motion to dismiss, although only for their existence and not the truth of the matters contained therein."). Therefore, Defendants' use of the Exhibits here is improper, their motion must be denied or, at a minimum, the Court must disregard the improperly submitted Exhibits, Defendants' imposition of the truth of the facts in the Exhibits, and the arguments and Appendices that rely upon them. *See Friedl*, 210 F.3d at 83 (granting vacatur). As all of Defendants arguments rest on their version of the facts derived from the Exhibits, this also must result in denial of the motion.

### a.  *Analyst Reports*

Defendants improperly rely on analyst reports (Exs. 17-20, 22, 23, 24) for the "truth of the matter asserted" within them, to factually dispute the Amended Complaint's well-pleaded

allegations. Notably, the Amended Complaint relies on the May 28, 2024, RBC analyst report to plead contemporaneous falsity using *facts* from the report showing a "downward trend in volume growth." ¶¶54-63. Defendants improperly ask the Court to treat their other cherry-picked data and excerpts from the May 28, 2024 RBC analyst reports and the June 2024 Jefferies' reports as dispositive facts that rebut Plaintiffs' allegations arguing that no trend existed and interjecting counter factual arguments. Defs. Br. at 6-7, 17-18, 23, 25; Ex. 17 at 17; Ex. 18 at 1; Ex. 19 at 2 & charts 5-6. Moreover, Defendants point to Exhibit 20 (Defs. Br. at 8-9, 20) to argue that CW1's factual recollections and characterization of beer sales in June 2024 (¶117) were incorrect, effectively asking the Court to *agree* with the analyst's report and find as a *fact* that Defendants' arguments as to the state of STZ's beer sales in June 2024 is true. Similarly, Defendants misuse the December analyst earning preview reports for Q3 2025 (Exs. 22, 23, 24) to support their argument that the "truth was already out" and analysts *should have known* about the impending miss. Defs. Br. at 11. This mischaracterizes the Amended Complaint, which cites these *same reports* to prove the *opposite*: that analysts were *still deceived* by Defendants' "transitory" narrative just before the final disclosure (¶¶168-170), demonstrating this was not a case of analysts being "wrong," but of them being *misled*. These are impermissible factual disputes not to be resolved on a motion to dismiss created by Defendants' improper interjection of the Exhibits for their truth.

### b.  *Forms 4.*

Another of Defendants' flagrant violations is their reliance on Exhibits 25 and 26 to create Appendix C (ECF No. 31-3), a self-serving chart and calculation created by defense counsel *specifically to contradict* the Amended Complaint's well-pleaded allegations of scienter. *See*

15

¶¶210-216.[4] The Amended Complaint alleges Defendant Newlands' sales were suspicious, pleading that he sold over 23% of his common stock holdings (even after including additional common stock he received during the Class Period), the $17 million he received was 122% higher than his next highest year (¶212), and that none of his sales were made pursuant to a 10b5-1 plan (¶213). Instead of accepting these facts as true, Defendants introduce the Forms 4 as their own *extrinsic evidence* (Exs. 25 & 26) to *factually dispute* Plaintiffs' allegations, including through Appendix C. By doing so, they ask the Court to ignore the Amended Complaint's facts about the reasons Defendants' sales were unusual and suspicious and instead accept their own self-serving calculations about how to calculate his *total holdings* (including unexercised options), their calculations of what constitutes "profits" (e.g., excluding shares that are sold to pay taxes), and disregard that his acquisitions of stock were not volitional choices. This is a classic, impermissible attempt to "weigh evidence" and contradict the Amended Complaint.

Accordingly, the Court should disregard Defendants' arguments that rely upon the Forms 4 and Appendix C, or convert the motion to one for summary judgment thereby allowing Plaintiffs to obtain and present expert reports to establish Defendants' scienter.

### 2. Defendants' Motion Improperly Relies on Extra-Pleading Documents for the Truth of the Matter Asserted without Any Request for Judicial Notice

Defendants' reliance on Exhibits 21, 25, 26, 27, 28, 29, 30, 31, 32 — for which they sought no judicial notice—is a clear attempt to litigate factual disputes by submitting evidence. These documents are not referenced in, integral to, or attached to the Amended Complaint, and are submitted by Defendants for the truth of the matters they assert in their motion. Defendants cite to a U.S. Department of Labor's Bureau of Labor Statistics news release (Defs. Br. at 9, 24; Ex. 32)

---

[4] Appendix C is also part of the 98 pages of legal submissions presented by Defendants in support of their motion. The Court's order dated September 11, 2025 allowed just 40 pages. ECF No. 28.

16

to inject their own factual narrative about inflation and its effect on consumer behavior, directly contradicting the Amended Complaint's allegations that Defendants were aware of a specific slowdown in their *own* consumer base. ¶¶54-63. This is a classic example of submitting extrinsic evidence for the truth of the matter asserted to dispute Plaintiffs' allegations.

### 3. *The Exhibits Must Be Excluded, or If Considered, the Motion to Dismiss Must Be Converted to a Motion for Summary Judgment.*

Because Defendants did not move for judicial notice and because certain Exhibits are not attached to, incorporated in, or integral to the Amended Complaint, the Court should exclude them from consideration. Specifically, the Court should exclude the unquoted portions of analyst reports (Exs. 17-20, 22, 23, 24) and press releases and transcripts (Exs. 1-16), which Defendants rely upon to improperly build and spin the factual narrative and to dispute falsity. The Court must also exclude the Forms 10-K and 10-Q (Exs. 21, 27-31) and Forms 4 (Exs. 25-26), including the defense-created summaries, in Appendix C & D (ECF Nos. 31-3, 31-4), which Defendants use with their brief (*see, e.g.,* Defs. Br. at 4-5, 9-10, 25, 28-29, 35-39) to create a self-serving factual rebuttal. Finally, the Court must exclude the extrinsic, unreferenced documents (Exs. 21, 27-32). For the filings the Amended Complaint does reference (e.g., specific statements from press releases, transcripts, and analyst reports), the Court may consider only what those documents said, not the truth of Defendants' competing factual assertions built upon them.

If, however, the Court elects to consider any of Defendants' Exhibits for their asserted truth, Rule 12(d) mandates conversion to summary judgment accompanied by a "reasonable opportunity" for discovery and to present pertinent material. FED. R. CIV. P. 12(d); *Goel*, 820 F.3d at 559; *Friedl*, 210 F.3d at 83–84. Plaintiffs request such reasonable opportunity here.

**B. The Amended Complaint Adequately Alleges the Misstatements are False, Misleading and Actionable.**

Defendants' Motion to Dismiss is built on a faulty premise: that this case is an impermissible "fraud by hindsight" action based on little more than a missed forecast. Defs. Br. at 16. This is incorrect. The Amended Complaint pleads a classic case of securities fraud based on *contemporaneous knowledge*, where Defendants possessed specific, contradictory, internal facts (¶¶71-79) that rendered their public statements false the moment they were made. Defendants' attempt to segregate the misstatements into sanitized categories of "forward-looking" (Defs. Br. at 28) or "puffery" (Defs. Br. at 30) fails because it ignores the specific, particularized facts alleged in the Amended Complaint that made each statement materially false or misleading.[5]

*1. Defendants' Financial Projections are Not Protected by the Safe Harbor, were Knowingly False as Defendants were Aware of Material Undisclosed Facts that Undermined the Projections*

Defendants' primary argument—that their financial guidance statements are protected forward-looking statements—fails because the PSLRA's Safe Harbor is pierced when risk warnings are broad and generic and the Amended Complaint pleads with particularity that Defendants had actual knowledge of the falsity of the statements. *See* 15 U.S.C. § 78u-5(c)(1)(B).

---

[5] This is not a case of puzzle pleading as contended by Defendants Defs. Br. at 14-15. Unlike *Kempen Int'l Funds v. Syneos Health, Inc.*, 23-cv-8848 (AS), 2024 WL 1805011, at *2 (S.D.N.Y. Apr. 25, 2024) where the court dismissed a complaint that used "boilerplate" lists of adverse facts over a class period of "several years," "flatten[ing] that timeline" and "fail[ing] to specifically alleg[e] when these issues arose or when Defendants knew about them", Plaintiffs specifically allege the misstatements by identifying specific sentences within each quoted text. *See* ¶¶88-89, 92-93, 99-100, 112-113, 122-123, 127-128, 148-152, 157, 167. Defendants have conceded this as evidenced by their detailed chart in their Appendix A.

First, Defendants' "meaningful cautionary language" defense fails. The Safe Harbor requires "'substantive' company-specific warnings based on a realistic description of the risks," not "merely a boilerplate litany of generally applicable risk factors." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010). "Vague disclosures of general risks will not protect defendants from liability." *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F.Supp.2d 277, 304 (S.D.N.Y. 2013). Here, Defendants' generic warnings about "shifting consumer behaviors" (Defs. Br. at 29) were just such a "boilerplate litany" and were not meaningful for two key reasons. First, the cautionary language remained fixed and generic "even as the risks changed" and the internal "warning signs flared." *See Slayton*, 604 F.3d at 772-73. Second, and more critically, a defendant cannot warn of a *risk* that they know has *already occurred*. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 70 (2d Cir. 2001). Defendants' warnings about a *potential* "shift" were fraudulent when they possessed knowledge that their core beer brands sales growth was stalled or declining. *See In re Alphabet, Inc. Sec. Litig.,* 1 F.4th 687, 704 (9th Cir. 2021) (finding "risks that 'could' or 'may' occur is misleading to a reasonable investor when [company] knew that those risks had materialized."). This is not a "caution"; it is a concealment of a *known, present fact*. Moreover, such warnings that Defendants "expect" certain items to continue to impact results into FY 2025 but at the same contradict such warnings with their statements is inherently misleading.

Second, the Safe Harbor is pierced by the Amended Complaint's particularized allegations of actual knowledge. The Safe Harbor does not protect a speaker who makes a forward-looking statement with "actual knowledge by that per person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). The Amended Complaint alleges exactly this. By June 2024, *before* the July 3 call, it was "common knowledge" internally that the Beer Division was "on track to miss the initial plan for F2025" (¶76) and, most critically, STZ's own Chief Marketing Officer stated

19

that sales in the "canary in the coalmine" California market were "hitting the wall." (¶72). When Defendants provided guidance during the Class Period, they did so with the actual, contemporaneous knowledge that it was unachievable.

Nor are Defendants' statements mere puffery as Defendants contend. "[C]ourts have found that statements that generally would be puffery in one context are not puffery in another if made to reassure investors as to 'specific risks.'" *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 222 (S.D.N.Y. 2022) (collecting cases). Here, the challenged puffery statements were made in the context of other statements and were not standing alone. Moreover, many of these were specific, statements made in direct response to analyst questions about the *exact risks facing the company* that impacted STZ's sales. *See, e.g.* ¶¶97, 125, 205. When tied to a specific risk, such statements are material misrepresentations, not puffery. *Id.*; *see also In re Signet Jewelers Ltd. Sec. Litig.,* No. 16 CIV. 6728 (CM), 2018 WL 6167889, at *11-12 (S.D.N.Y. Nov. 26, 2018)(statements not puffery because many were made in response to direct analyst questions).

### a.   April and May 2024 Projections.

Defendants' initial 7-9% beer net sales growth guidance (¶¶81, 84, 95) and their assurances that the business was "on track" (¶85) were made without a reasonable basis. A projection is misleading if it lacks a reasonable basis at the time it is made. *See Omnicare, Inc. v. Laborers Dist. Council*, 575 U.S. 175, 184 (2015). Here, Defendants issued this misleading guidance while aware of, and failing to disclose the true impact of, significant negative trends already underway. At the time these representations were made, STZ was already experiencing negative impact to its beer sales from the increasing Hispanic unemployment rates and changing consumption habits, value seeking behaviors and channel shifts, including in its key market of California. ¶¶54-66. Further, STZ was aware that these trends were not transitory but would have an ongoing adverse impact on

20

its sales growth and income growth. *See* ¶¶89, 99. Consequently, as a result, STZ would be unable to achieve its current guidance for STZ's beer sales growth and income growth in FY2025. *See* ¶¶88-89, 99-100.

Defendants' argument that the business was still "growing" (Defs. Br. at 17) is a deliberate mischaracterization. The market's focus was not on *any* growth, but on the 7-9% *rate of growth* (¶¶50-53, 62, 129). Plaintiffs have not contended, as Defendants attempt to argue, that STZ's beer sales were decreasing year over year. The Amended Complaint alleges that Defendants knew that the YoY growth rate of STZ's beer growth was trending downward and that Defendants knew that unemployment and consumer preferences had rendered their previous projections and opinion statements false and misleading.

Defendants' arguments relying on the "2-year average line" similarly miss the mark. The Amended Complaint does not allege anything to do with the two-year averages but rather relies on the month-to-month data points represented by the bar graphs (and not the two-year average lines). ¶¶54-56. Defendants inappropriately introduce cherry-picked statements for the truth of the matter asserted from the RBC Report to attempt to attack the data alleged at issue in the Amended Complaint. Unable to address the clear data, Defendants resort to making unsubstantiated claims of fact that the observed downward trend is not a trend but rather are just "spikes in "Y/Y Volume Growth" for a few months in 2023 for one brand likely reflects seasonality, or strong performance as compared to FY 2022, in tracked channels, for that product, in those months." Defs. Br. at 17. Nowhere in Defendants brief is there any support for this conjecture and they cite to no support for their conclusions. In a last-ditch effort, Defendants argue that because STZ's net sales growth rate in FY2025 is conservative as compared to FY2024 or in line has nothing to do with whether

the FY2025 guidance is misleading. Defendants are comparing apples (monthly YoY data) to oranges (the 2-year average line).

### b.   *July 3, 2024 Projections.*

Defendants' July 3, 2024 reaffirmation of the 7-9% growth guidance (¶104) and Defendant Newlands' statement that "our top line performance is sustainable" (¶108) were knowing and material falsehoods. Plaintiffs allege that by July 3, 2024, it was already known by STZ management that the growth guidance was unobtainable and growth in California had hit a wall. *See* ¶¶64-66, 72-76, 166, 209. Defendants' attempt to discredit these specific allegations (Defs. Br. at 19) fails. Their argument that CW1's statements are "vague" and "conclusory" ignores that CW1, the Senior Director of Trade Marketing for the Beer Division (¶67), provided highly specific, non-conclusory facts: (i) the precise, alarming phrase "hitting the wall"; (ii) the source of that phrase, the Chief Marketing Officer (¶72); (iii) the specific timeframe, "by June 2024" (¶76); and (iv) the existence of specific monthly "Drags and Drivers" reports that detailed these risks (¶75). These details are more than sufficient to "support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

Defendants' reliance on *In re DraftKings Inc. Securities Litigation*, 650 F. Supp. 3d 120, 155-56 (S.D.N.Y. 2023) is unavailing, as the court there rejected CW allegations that lacked "positions, length of employment, location of employment, or their respective roles or sources of knowledge" which resulted in an "indicia of unreliability" to not credit the statements. *Id.* That is not at issue here as this information was obtained by Plaintiffs' counsel from CW1 and the very information which was not present in *DraftKings*, has been detailed in the Amended Complaint (*see* ¶67 (detailing title, dates of employment and role)). Defendants' other authority is likewise

22

inapposite. *See Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (finding "unsupported" allegations that the deficiencies were known outside the company "in the industry" insufficient). Here, however, CW1 provided specific details of why such information was "well known" within STZ, including the "Drags and Drivers" reports and the Chief Marketing Officer's party admissions about sales "hitting the wall." ¶¶72, 75.

Defendants' further claim that these facts are merely "anecdotal" allegations about "two products' sales in California" (Defs. Br. at 19) is a gross mischaracterization. Defendants' reliance on *Frankfurt-Trust Investment Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196 (S.D.N.Y. 2018), is misplaced. In *Frankfurt-Trust*, the court found allegations from employees in "a single UTAS unit" were insufficient to show knowledge of problems in the entire subdivision, given their "limited vantage point" and lack of insight into other divisions. *Id*. at 223. Here, the allegations are the opposite: they come from the Chief Marketing Officer (¶72) and concern STZ's largest market (California, ¶21) and its largest and most critical brands (Modelo and Corona, ¶¶72, 85, 144), which together are the core of the entire national portfolio (¶22) in which CW was the Senior Director, Trade Marketing – Beer Division (¶67). A catastrophic failure in the STZ's "canary in the coalmine" (¶74) is not an "anecdotal" data point; it is a material, portfolio-wide fact that directly contradicts Defendants' national guidance.

Defendants already knew that their guidance was unobtainable by June 2024 and were likewise aware of the negative factors of unemployment and shifts in consumer preferences that were pulling down sales and growth. *See* ¶¶64-66, 72-76, 166, 209. A reaffirmation of a prior statement is a new, discrete statement, fully actionable if the speaker knows or should know the original statement is no longer accurate. When Defendants reaffirmed the FY 2025 guidance on July 2, 2024 (¶141), they did so after their own marketing director confirmed the beer segment

was "hitting the wall.". Reaffirming guidance in the face of such directly contradictory, known internal facts is a textbook violation. *See Novak*, 216 F.3d at 311-12.

### c.   *September – December 2024 Projections.*

Defendants' argument that they cured any prior omissions by "disclosing the challenges" on September 3, 2024, is wrong. (Defs. Br. at 21). Defendants claim their "acknowledgment of the challenges... discredits any allegations of falsity," and that the Amended Complaint "contains no well-pleaded allegations of fact showing that these as-revised Projections were unattainable." (Defs. Br. at 21-22). This is a classic "half-truth" argument.

The September 3, 2024 disclosure was not a full correction but another misleading statement. Defendants did not just *disclose* "macro consumer headwinds" (Defs. Br. at 21); they actively and repeatedly *minimized* the nature of these headwinds, falsely assuring the market they were temporary. The "as-revised" projections were unattainable precisely because they were based on the knowingly false premise that the structural collapse of their core consumer channel was merely "transitory." This deception continued for months: ¶145 (October 3, 2024, Hankinson stating "We believe these headwinds are transitory in nature"); ¶146 (October 3, 2024, Newlands stating: "we don't see this as any radical change in the long-term perspective on the business. It is purely a near-term issue.") Notably, on December 3, 2024, *after Q3 2025 had already closed*, Defendant Hankinson doubled down, stating, "we saw that as more transitory than structural" and "we still tend to think that the headwinds we're facing aren't permanent in nature." ¶¶165, 172.

These statements were demonstrably false, as proven by Defendants' own admissions on January 10, 2025. The problem was never "transitory" and a fact that Defendants knew on December 3, 2024 because the 3Q 2025 had already concluded. This is reinforced by Defendants' own admissions in November and December 2024 that they knew the reasons why Q3 2025 would

miss the consensus and require a downgrading of STZ's guidance (without disclosing the impact of such STZ's financial statements). ¶¶163, 166, 184, 181.

Furthermore, Defendants' argument that CW1's June statements cannot be used to show the falsity of statements after the September revision (Defs. Br. at 22) is contrary to law. This is doubly true because the Amended Complaint pleads that these problems did continue. The structural problems CW1 and the CMO identified in June (¶72) did not magically disappear. In fact, CW1's former colleagues confirmed in during the fall of 2024 (with fall officially starting on September 22, 2024 after the September 3, 2024 revision during the summer) that STZ was "well behind" its internal bonus targets and "falling short" of the plan. ¶69. As the Second Circuit has held, "'allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period.'" *In re AppHarvest*, 684 F. Supp. 3d at 262 (quoting *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015)). Here, the allegations of a structural collapse in June, corroborated its ongoing nature by allegations of missed bonus targets in the fall, strongly support the inference that the problems were not "transitory" in September, October, and December 2024, and that Defendants' statements to the contrary were knowingly false. Thus, "[b]y downplaying negative trends as temporary or discrete, these statements were plausibly misleading." *Sills v. United Nat. Foods, Inc.*, No. 23-CV-2364 (JGLC), 2024 WL 4188324, at *9 (S.D.N.Y. Sept. 13, 2024).

### 2. Defendants' Statements on Consumer Health and Shifting Behaviors Were False.

#### a. April and May 2024 Statements.

Defendants' statements that "[w]e're very pleased with the health of our consumer" (¶87) and "we have been relatively immune" (¶91), and "relatively bullish" (¶98) are not puffery; they are specific, factual representations about the *present* state of STZ's core business driver, its

consumer. These statements are not forward-looking. They are assertions about a *current condition*. When a company's entire business model rests predominantly on one consumer (¶¶17-23) and Defendants repeatedly boast of their "on-the-ground" intelligence into that *exact* consumer (¶¶31-47), statements about that consumer's "health" are material facts. These statements are not inactionable puffery or opinion. *See supra.*

### b.    *July 3, 2024 Statements and Material Omissions.*

Similarly, Defendants' July 3, 2024 statements that the "the demographic tailwinds from Hispanic consumers . . . give us further assurance that "our top line performance is sustainable" (¶108) is a misrepresentation of then-existing fact. These were made *after* CW1 and the CMO knew the sales of its core beers was stalled and declining (¶72) and "on track to miss" its plan (¶76) *precisely because* of the poor health of its core consumers.

### c.    *September, October, and December 2024 "Transitory" and Consumer Misrepresentations.*

Finally, Defendants' characterization of the known, structural headwinds as "transitory in nature" (¶145) and "purely a near-term issue" (¶146) are actionable misrepresentations of *present fact*. These statements are not "forward-looking" as they characterize a *current* problem.

A statement that a problem is "transitory" is a factual claim about its existing attributes. This claim was false. Defendants knew the problem was not a temporary "blip" but a *structural collapse* in their core, untracked channels that had been ongoing since at least June. (¶¶72, 76, 166). As they were forced to admit on January 10, 2025, the problem was "prolonged" (¶182) and driven by a fundamental "shift to value-oriented larger pack size" (¶184) and a collapse in the "independent retailers... not captured in Circana data." (¶185). By misrepresenting the *present*

26

*nature* of the crisis as "transitory," Defendants made actionable misstatements of fact, which also rendered their "opinions" about the future misleading under *Omnicare*.

### d. Defendants' Statements Were Actionable Half-Truths.

Defendants' argument that they are shielded by reporting "accurate historic data" (Defs., Br. at 27) fails as even a "literally true" statement is misleading under Rule 10b-5 if it omits material facts necessary "in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); *see Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth"). Once "a company speaks on an issue or topic," it must "tell the whole truth[.]" *Gimpel v. The Hain Celestial Grp., Inc.,* 156 F.4th 121, 141 (2d Cir. 2025). Thus, "[t]o determine whether a statement is misleading, our inquiry is objective, from the perspective of a 'reasonable investor,' considering not only a statement's 'literal truth' but also its 'context and manner of presentation.'" *Id.* (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019)). Accordingly, "half-truths—representations that state the truth only so far as it goes, while omitting crucial qualifying information—can be actionable misrepresentations [under Section 10(b) and Rule 10b-5]." *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 30 (S.D.N.Y. 2019) (quoting *Univ. Health Servs., Inc. v. United States*, —— U.S. ——, 136 S.Ct. 1989 (2016)). As such, even if affirmative statements are "literally true" they may be rendered false by what they fail to disclose. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) (citation omitted). Here, Defendants' misstatements provided a "false impression from the statement" rendering there statements materially false and misleading. *Freudenberg v. E\*Trade Fin. Corp.*,

27

712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (misstatements actionable where investors would "receive[] a false impression from the statement").

Although many of the misstatements by Defendants include true statements, they were nonetheless misleading. Defendants' statements omitted material information about the true extent the shift in Hispanic consumers' behaviors were affecting STZ's FY2025 guidance as they attempted to counteract these effects by increasing marketing during Q3 2025. ¶¶151, 157. For example, on the July 2, 2024 call, when analysts questioned weakness, Defendants selectively highlighted isolated, positive metrics to create a false impression of strength. Newlands, for example, deflected by pointing to the "buy rate[s]" of Hispanic consumers (¶110), while Hankinson dismissed weak scanner data as mere "anomalies" and claimed things were "revert[ing] back to the norm." (¶96). On October 4, 2024 and December 3, 2024, although Defendants discussed the headwinds and how consumer behaviors were changing, Defendants failed to state that these were materially impacting and had impacted STZ's business and ability to achieve its then existing guidance. ¶¶156, 165. These statements were materially misleading because Defendants omitted the "most important information" investors needed: that these "loyalties" and "norms" were *not* translating to sales. *See Meyer*, 761 F.3d at 251. At the exact time they made these statements, Defendants possessed contradictory, non-public knowledge that their Beer Division was "hitting the wall" and it was "common knowledge" that the guidance was unachievable due the negative impact on the Hispanic consumers. ¶¶67-76.

### 3. *Defendants' "Opinion" Statements Are Actionable Because They Omitted Known, Contradictory Facts.*

Statements of opinion are actionable if "'the speaker omit[ted] information whose omission makes the statement misleading to a reasonable investor.'" *In Re Shanda Games Ltd. Sec. Litig.,*

28

128 F.4th 26, 43 (2d Cir. 2025), *cert. denied sub nom. Shanda Games Ltd. v. Monk,* No. 25-351, 2025 WL 3131847 (U.S. Nov. 10, 2025) (*quoting Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)). "*Omnicare* affirmed that liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'" *Tongue,* 816 F.3d at 210. This is precisely what the Amended Complaint alleges. Defendants' optimistic opinions were misleading because they failed to disclose particular and material facts in their possession that "seriously undermined the accuracy of their alleged opinions." *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999). At the time Defendants made statements were made about their future performance, not only did Defendants know of material information that rendered their opinions misleading, but also knew that the projections were unobtainable.

Specifically, the Amended Complaint alleges that at the time they issued the guidance, Defendants knew of contradictory facts that meant the guidance was unobtainable. Even after the September 3, 2024 downward guidance revision, Defendants were reassuring the market that it was obtainable and was "not dependent on an improvement in the macroeconomic and consumer environment" in the beer market for them to obtain the newly revised guidance. (¶¶126, 129). Defendants continued to present false and misleading impressions that things were getting better, the issues STZ's were transitory, the health of their consumers were strong, and the "tailwinds" from their Hispanic consumers were propelling STZ to reach their guidance even as late as December 3, 2024 (after the closing of Q3 2025) when they already had possession of the information confirming the opposite. These statements, for example, when Defendant Hankinson stated on October 3, 2024, that "[w]e believe these headwinds are transitory in nature" (¶145), were not subjective judgments. They were assertions that implied a factual basis. These statements

29

are actionable because they did not "fairly align[] with the information in the issuer's possession at the time." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 134 (S.D.N.Y. 2020). The information in Defendants' possession—that their core market was "hitting the wall" (¶72,) their plan was already missed (¶76), and having already completed Q3 2025 before the December 3, 2024 misstatements how depletions were going to perform in Q3 2025 (¶165)—showed that the problem was *structural* and *ongoing*, not "transitory."

## C. The Amended Complaint Pleads a Strong Inference of Scienter.

To survive dismissal, the Amended Complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The scienter requirement is met where the complaint alleges facts showing either: 1) a 'motive and opportunity to commit the fraud'; or 2) 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Blanford*, 794 F.3d at 306 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)). The Amended Complaint strongly pleads both.

The inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. But "the inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences," but instead "only 'strong in light of other explanations.'" *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 451 (S.D.N.Y. 2019) (quoting *Tellabs*, 551 U.S. at 324).

### 1. *Defendants' $25 Million in Suspicious Insider Sales Show a Motive for Fraud.*

Motive and opportunity alone is sufficient to allege scienter. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000). "Factors considered in determining whether insider

30

trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic*, 252 F.3d at 74. Defendants' stock sales during the Class Period were unusual and suspicious in both timing and amount. While knowing of STZ's issues with meeting its FY2025 guidance and issues from its consumer's behavior shifts, Defendant Newlands sold 67,864 shares for $17,077,804 and Defendant Hankinson sold 35,856 shares for $8,639,000. (¶¶211, 216). Defendant Newlands' sales were dramatically out of line with his prior trading practices, representing a 122% increase over his next-largest year (¶212).

### a.    *The Magnitude of Sales and Percentage of Holdings Sold Support Scienter*

"When evaluating stock sales, the number of shares sold by an insider compared with the number he could have sold is more probative on the question of whether Class Period sales are unusual or suspicious." *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 497 (S.D.N.Y. 2018), *aff'd in part*, v*acated in part, remanded sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020). The sheer magnitude of these sales—over $17 million for Newlands and $8.6 million for Hankinson—is, on its face, unusual. (¶¶211, 216). Courts have found sales of far lesser amounts sufficient to support scienter. *See Freudenberg,* 712 F. Supp. 2d at 200 (two defendants selling $6 million); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 222 (D. Conn. 2001) (proceeds by the individual defendants sales of stock totaled nearly $31.4 million). The shares Newland sold were largely vesting restricted stock units, for which Newlands paid nothing, or options with a low exercise price. (¶214).

 Defendants' arguments that their sales were not suspicious are unavailing at the pleading stage. Their claim that 'Newlands' *holdings* increased (Defs. Br. at 36) is a misleading tactic that improperly counts unexercised options against actual, massive share sales. Defendants ask the

31

Court to consider Newlands vested options when accounting for the percentage of his holdings sold, but the Second Circuit has not settled whether or not vested, unexercised options must be included in such calculation. *See In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006). In *EVCI*, the court was "more inclined to follow Judge Brieant's view, as expressed in *Oxford*, that vested but unexercised options are not shareholdings." *Id.* (citing *In re Oxford Health Plans,* 187 F.R.D. at 140).

Defendants' present a statistical sleight-of-hand. Defendants' own exhibit shows this "increase" is due to the passive receipt of new "Exercisable Options" (compensation), not an active decision by Newlands to increase his holdings. *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, No. 22-CV-6978 (AS), 2024 WL 456745, at *6 (S.D.N.Y. Feb. 5, 2024) (noting individual defendants "increased holdings came from the automatic vesting of restricted stock units" as "new shares for free" which over one-third were sold to "cover the resulting tax obligations" as having "benefited from the inflated share price."). Even if this Court were to consider the contrary view, the inclusion of options presents a factual question inappropriate for a motion to dismiss. As the court in *Nguyen* noted when declining to resolve this exact issue, it is impossible to determine from SEC filings at the pleading stage which options were truly "exercisable" (i.e., vested *and* "in the money") versus those that were unvested or had strike prices above the market price. *See Nguyen*, 297 F. Supp. 3d at 497-98. This fact-intensive inquiry "can be calculated more precisely by the parties in discovery and re-assessed at summary judgment." *Id.* at 498.

Notably, Newlands sold ***over 700% of his non-option*** shares held at the start of the Class Period. (¶214). This fact alone demonstrates that his trading was "in amounts dramatically out of line with prior trading practices[.]" *In re Glenayre Technologies, Inc. Sec. Litig.*, No. 96 CIV. 8252(HB), 1998 WL 915907, at *4 (S.D.N.Y. 1998), *aff'd*, 201 F.3d 431 (2d Cir. 1999). Defendant

32

Hankinson's sales are likewise probative. He sold 35,856 shares for over $8.6 million. (¶¶216-217). Such a complete liquidation of one's holdings is classic evidence of scienter.

### b. The Timing of the Sales Were Suspicious

Defendants' main argument is that in order for a sale to be suspicious it has to be within two months if not weeks of the final corrective disclosure. (Defs. Br. at 35). Although courts have found sales within these restrictions to support scienter, *see In re Oxford Health Plans,* 187 F.R.D. at 139 (finding sales two months before final corrective disclosure suspicious when insiders knew a negative public announcement was forthcoming), it should not be dispositive, when it is alleged that the misrepresentations and fraud was alive in the market.

With sophisticated defendants, as here, it does not make sense that an executive, especially one that does not have a 10b5-1 plan, would sell shares in the most incriminating way possible: right before the announcement of negative news that they know that the market does not expect. This is not to say that greed and hubris do not win out in certain situations, but if an executive looks to sell shares without throwing up warning flags they would sell their shares in smaller tranches in advance of the negative news. Defendants' claim that sales were not bunched (Defs. Br. at 35) is irrelevant; Defendants sold stock throughout the period they were actively misleading the market.

Notably, the Second Circuit has "abstain[ed] from imposing a brightline rule that securities-fraud plaintiffs *must* allege that sales took place in the final 100 days of a class period or that all Individual Defendants engaged in such sales." *Gimpel*, 156 F.4th at 145. Here where Defendant Newlands beginning trading two weeks after the first alleged misstatement in which the stock price was rising and the market was optimistic of STZ's FY2025 and stopped trading on November 14, 2024, less than two months before the final disclosure. (¶¶80, 173, 211). Defendant

33

Newlands' sales were timed to maximize his returns on inside information, occurring in a tight cluster between October 10 and November 14, 2024 (¶216)—after he had deceptively labeled the headwinds "transitory" (¶145) but before the full truth was revealed. These massive, timely, and non-10b5-1 sales provide a concrete and personal financial motive that is "at least as compelling" as any innocent explanation. Finally, Defendants' arguments that the STZ's buybacks of stock do not support a lack of scienter, rather it strengthens it. *See In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 6482014, at \*13 (N.D. Cal. Nov. 4, 2020) ("With regards to stock buy-backs, cursory background knowledge suggests that they enrich shareholders, such as [individual defendants], in a way that is entirely consistent with scienter.").

### c. The Discretionary Nature of the Sales Is Highly Suspicious.

Defendants' sales were discretionary and not made pursuant to a 10b5-1 plan. (¶¶213, 216). The absence of a pre-existing, non-discretionary trading plan means these massive sales were volitional acts made at a time when Defendants possessed material, non-public information that their core operations' beer sales were declining due to shifts in their key demographic behaviors). The *absence* of such a plan is compelling evidence of scienter. *See Nguyen*, 297 F. Supp. 3d 472, 494-95; *In re Galena Biopharma, Inc. Sec. Litig.,* 117 F. Supp. 3d 1145, 1167 (D. Or. 2015).

### 2. Plaintiffs Plead Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.

Circumstantial evidence is sufficient to establish scienter where defendants "knew facts or had access to information suggesting that their public statements were not accurate; or [] failed to check information that they had a duty to monitor." *Blanford*, 794 F.3d at 306. When such contradictory facts concern a company's "core operations," a strong inference arises that "high-level officers and directors had knowledge of those facts by virtue of their positions." *In re Atlas*

34

*Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004). STZ's Beer Division is its primary revenue and profit driver, and the Hispanic demographic is its single most critical consumer base, accounting for "over half of STZ's total volume" and "50% of net sales in the beer portfolio." (¶22). These are not peripheral matters; they are the fundamental drivers of STZ's business. Courts in this Circuit consistently find scienter where undisclosed negative facts relate to such a material part of a company's business. *See In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (knowledge imputed where market comprised 21% of revenues); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 CIV. 8557 CM, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (knowledge imputed where agreement affected 18% of projected revenues). The 50% of net sales at issue here (¶22) dwarfs those cases, making it "absurd to suggest that . . . senior management" was unaware of the adverse facts. *Avon*, 2019 WL 6115349, at *20.

This inference is strengthened by Defendants' own admissions that they meticulously tracked this exact data, possessing "on-the-ground market intelligence" (¶44), tracking "heavy Hispanic ZIP codes" (¶43), "closely monitoring for any signs of ongoing pressures" (¶47), and "pressure testing" all portfolio decisions against data from "almost 20% of our unique consumer data representing Hispanic consumers" (¶42). This scenario is analogous to *zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, where the court found it "virtually inconceivable" that executives were unaware that the hotel deals central to their public "growth story" were not consummated. *zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 792 F. Supp. 3d 407, 441 (S.D.N.Y. 2025), *reconsideration denied*, No. 24 CIV. 1030 (PAE), 2025 WL 2962772 (S.D.N.Y. Oct. 21, 2025). Here, STZ's "growth story" was entirely dependent on its core Hispanic consumer, and

35

Defendants' own admissions confirm they monitored this demographic obsessively (¶¶21-23, 42-44, 47, 87, 97, 110, 125, 146, 156).

Further, the Amended Complaint pleads Defendants' access to this information with specificity, detailing their extensive research and data collection on the Hispanic consumer. Moreover, STZ's proprietary intelligence on their Hispanic consumers was extensive, with Defendants stating that "almost 20% of our unique consumer data representing Hispanic consumers," which was "pressure tested" for all portfolio decisions. (¶42). This constant monitoring provided Defendants with direct access to the very facts they concealed, including internal "business reporting" which made it "clear" by June 2024 that the Beer Division was "expecting a lot of headwinds" (¶71) and was "on track to miss the initial plan for F2025" (¶76). This internal reporting included monthly "Drags and Drivers" reports, which CW1 confirmed described facts affecting the Beer Division and "called out forward risks." (¶75). *Sills*, 2024 WL 4188324, at *13 (finding core operations bolsters scienter as given segment contributed 95% of net sales and as such defendants would have known of the effects of the actions on the company's financial results). Moreover, Defendants repeatedly discussed the specific matters at issue in this litigation at the time of each of the alleged misstatements. *See In re Romeo Power Inc. Sec. Litig.*, No. 21 CIV. 3362 (LGS), 2022 WL 1806303, at *5 (S.D.N.Y. June 6, 2022) (detailed knowledge and involvement in relevant issues supported scienter); *S. Ferry LP # 2 v Killinger*, 687 F. Supp. 2d 1248, 1258-60 (W.D. Wash. 2009) (intimate knowledge of issues, direct responses to analyst questions, and admissions demonstrated actual knowledge).

This internal knowledge, possessed by Defendants by June 2024, stands in stark contrast to their public assurances on July 3, 2024 where Defendant Hankinson stated, "we feel really good about the guidance we gave for the full year" (¶111). This statement was knowingly false. By June

36

2024, which was the beginning of STZ's second fiscal quarter 2025, it was "common knowledge" in STZ as well "clear from business reporting" that the Beer Division was "behind" and "on track to miss the initial plan for F2025" (¶¶71, 76). In fact, the Chief Marketing Officer had personally admitted that sales in the core California market were "hitting the wall," and "even Modelo" was declining (¶72). This was documented in monthly "Drags and Drivers" reports that were "calling out forward risks" (¶75). Unquestionably, Defendants were aware of the issues impacting this key Hispanic consumer, the health of that consumer, and the consequent impact on FY2025 guidance. *Stadium Cap.*, 2024 WL 456745, at \*6 (inferring that named individual defendants aware of information on core operations even when not alleged to have reviewed specific reports).

Indeed, CW1 described an internal process known as "ring-fencing", which was implemented *precisely when guidance was at risk* when results were falling short. CW1 explained that this process would typically be undertaken during the second fiscal quarter and implemented in the third fiscal quarter. (¶78). As CW1 explained, through this process STZ undertook a procedure for identifying and "carving out" "uncommitted" monies from the budget, thereby freeing up funds that may be re-deployed as increased marketing spending in the latter half of the year to salvage the missed forecasts. (¶¶38, 78). In fact, Defendants did increase their marketing spending in the third quarter at the same time it was lowering its guidance for beer net sales growth. (¶¶119-20). Defendant Hankinson later admitted to analysts that Defendants spent "significantly more money in marketing to drive and to support our brands" in the third fiscal quarter because "when we talk to our marketing teams, we ask them what they need and they tell us what they need, right? And so this is reflective of what our team thinks it needs to drive the type of performance that's included in our outlook." (¶37). These allegations establish that Defendants had "access to information contradicting their public statements," rendering their assurances

37

knowingly or recklessly false. *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, No. 23-CV-431, 2024 WL 451691, at *13 (S.D.N.Y. Feb. 5, 2024).

## D. The Amended Complaint Adequately Pleads Loss Causation.

For loss causation, "there is no heightened pleading standard." *Gimpel*, 156 F.4th at 151. To plead loss causation, Plaintiffs "must simply give . . .some indication of the actual loss suffered and . . . a plausible causal link between the loss and the alleged misrepresentations" and the burden is "not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). To adequately plead loss causation, a plaintiff "may do so either by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) that "'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir.2010) (quoting citation and internal quotation marks omitted)).

The Amended Complaint sufficiently pleads loss causation by alleging that Defendants' misrepresentations and omissions concealed the true nature of STZ's structural business problems, thereby artificially inflating the stock price, and that the stock declined precipitously when the *truth* of those problems was finally revealed. Defendants' primary argument—that the "full truth" was disclosed on October 3, 2024, and that the January 10, 2025 disclosure was not new, corrective information—is fundamentally flawed. (Defs. Br. at 39). This argument ignores the central allegation of the fraud: Defendants' deceptive "transitory" narrative.

This is not a "death by a thousand cuts" case where the market slowly absorbed bad news. This is a classic case of a partial disclosure coupled with a material, reassuring lie. On October 3, 2024, Defendants did not disclose the *truth*; they disclosed a *symptom* and immediately neutralized

38

it with a *lie* (that the cause was "transitory in nature" and "purely a near-term issue"). ¶¶143, 145-46). This lie was effective. It successfully deceived the market, concealed the *true*, *structural* nature of the problem, and prevented the stock from fully declining to its true value. Analysts were misled, concluding that the "summer beer slowdown appears to have been transitory in nature." ¶¶168-169, 171. Thus, the 4.7% stock drop on October 3 represented the market's reaction to the *partial* bad news, while the *artificial inflation* caused by the "transitory" lie and omissions of the true extent of the value seeking behaviors remained. *In re Salomon Analyst AT&T Litig.,* 350 F. Supp. 2d 455, 472 (S.D.N.Y. 2004) (finding  partial disclosure "does not break the causal chain"). It also did not reveal the full impact of the ongoing consumer shifts on STZ's financial results, which again, was not fully disclosed until January 10, 2025. *See, e.g.,* ¶¶148-49, 157, 167, 202.

The causal link was completed on January 10, 2025. On that day, the "transitory" lie was corrected. Defendants were forced to admit the problems were, in fact, "prolonged" (¶182) and structural, stemming from a collapse in "independent retailers" (¶185) and an "unfavorable mix" (¶184). In response to the news entering the market on January 10, 2025, STZ's common stock fell $37.47 per share, or 17.9%. ¶189. The analyst commentary confirms this stock drop was a direct reaction to the *correction* of Defendants' "transitory" narrative, which had successfully deceived the market. Analysts were surprised about the change in guidance, the impact of consumer behaviors, the depletions miss, and that the problems were "more prolonged" given that Defendants in December "sounded" that they were "moving past transitory headwinds." ¶¶192-194. UBS confirmed the shock, stating "the magnitude of change to the company's updated beer outlook... was greater than we think most were expecting." ¶205. This two-step disclosure—a partial truth paired with a lie, followed by a correction of that lie—is a textbook pleading of loss causation. *See, e.g.*, *In re Signet Jewelers*, 2018 WL 6167889, at *16 (finding loss causation

39

adequately alleged for nine corrective disclosures and defendants "may challenge the impact" on the market at a later stage).

### E. The Amended Complaint Adequately Alleges a Violation of §20(a).

The Amended Complaint adequately alleges a claim under Rule 10b-5. As Defendants sole argument is that the Section 20(a) claim must be dismissed for Plaintiff failing to adequately state a claim under Rule 10b-5, Defendants' Motion must be denied as to the Section 20(a) count as well. *See Ganino*, 228 F.3d at 170 (2d Cir. 2000).

## V. CONCLUSION.

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.

Dated: November 14, 2025

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/ s / Daniel Tepper*
Daniel Tepper
Nicholas I. Porritt

*Counsel for Lead Plaintiff Low Lily and Plaintiff Macaria Meza and Lead Counsel for the Class*

Levi & Korsinsky, LLP
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel: (202) 363-7500
Fax: (212) 363-7171
Email: dtepper@zlk.com
Email: nporritt@zlk.com

Alexander A. Krot III (*pro hac vice* application forthcoming)
1101 Vermont Ave, NW Suite 800
Washington, DC 20005

Tel: (202) 524-4290
Fax: (212) 363-7171
Email: akrot@zlk.com

41

**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2025, I electronically filed the foregoing by using the CM/ECF system which will send a notice of electronic filing to all counsel or parties of record.


/s/ Daniel Tepper
Daniel Tepper